**GENERAL CINEMA CORPORATION, Plaintiff,**

v.

**BUENA VISTA DISTRIBUTION CO., INC., Defendant.**

**BUENA VISTA DISTRIBUTION CO., INC., Counter-Claimant,**

v.

**GENERAL CINEMA CORPORATION, Counter-Defendant.**

No. CV78–3284–Kn.

United States District Court, C. D. California.

Feb. 5, 1982.

Swerdlow, Glikbarg & Shimer, Los Angeles, Cal., for plaintiff, counter-defendant General Cinema Corp.

Donovan, Leisure, Newton & Irvine, Los Angeles, Cal., for counter-claimant and defendant Buena Vista Distribution Co., Inc.

### ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT

KENYON, District Judge.

This suit involves an antitrust challenge to a practice in the licensing of motion pictures known as "split of product agreements" or "splits." Under these arrangements, which have existed from time to time in various areas throughout the country, the members of the split meet to divide among themselves the upcoming films to be released. Each participating movie theater owner ("exhibitor") receives, with respect to the film or films allocated to it, what is referred to as a "first right of negotiation" or a "first opportunity to negotiate" with the distributor for the film.

The party challenging this practice, Buena Vista Distribution Co., Inc., the principle domestic distributor of films produced by Walt Disney Productions, was originally named as a defendant in this action by plaintiff General Cinema Corp., which is a motion picture exhibitor operating one of the largest chains of theaters in the country. In August, 1978, General Cinema filed suit against Buena Vista, contending that an alleged imposition of minimum film rentals based on a per capita charge for each customer constituted unlawful price-fixing under Section 1 of the Sherman Act, 15 U.S.C. § 1. In September, 1978, Buena Vista answered and filed a counterclaim against General Cinema asserting that the latter's participation in split agreements also constituted unlawful price-fixing under Section 1 of the Act. Buena Vista seeks injunctive and declaratory relief, as well as treble damages for the splits involving General Cinema which have occurred during and after the four-year statute of limitations period prior to the date of the suit.

On May 19, 1980, Judge Lawrence Lydick of this court granted Buena Vista's motion for judgment on the pleadings as to General Cinema's entire complaint for lack of antitrust standing. *General Cinema Corp. v. Buena Vista Distribution Co.,* No. 78–3284 (C.D.Cal. June 25, 1980). That part of the case is now on appeal in the Ninth Circuit. *Id., appeal docketed,* No. 80–5851 (9th Cir. Oct. 22, 1981). On the same day, Judge Lydick denied Buena Vista's further motion for partial summary judgment on its counterclaim. A little less than a year later, Buena Vista renewed its motion for partial summary judgment as to liability based upon a more extensive record and the Supreme Court's intervening decision in *Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980), in which the Supreme Court reversed a decision by the Ninth Circuit which had held an alleged price-fixing agreement to be subject

to the antitrust rule of reason and thus not illegal per se under Section 1 of the Sherman Act.

 Section 1 proscribes "Every contract, combination ... or conspiracy, in restraint of trade." However, the Supreme Court has long interpreted the Act to prohibit only those restraints of trade which are "unreasonable." Two methods or "rules" of antitrust analysis have developed. Under "the prevailing standard of analysis," the "rule of reason," the courts weigh the pro- and anticompetitive effects of a challenged restraint to determine if it is "unreasonable." *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). Certain practices, however, have been held unreasonable *per se*, and therefore illegal under the "per se rule," because they facially appea[r] to be one[s] that would always or almost always tend to restrict competition" and have no "redeeming competitive virtues and ... the search for those values is ... almost sure to be in vain." *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 13, 19–20, 99 S.Ct. 1551, 1559, 1562, 60 L.Ed.2d 1 (1979).[1] Once a court has identified "plainly anticompetitive" conduct to be governed by the per se rule, it is foreclosed from undertaking an inquiry into the reasonableness of such conduct. *Id.* at 8–9, 78 S.Ct. at 519–20. "Price-fixing" is the legal label given to one category of restraints on competition that has long been recognized as within the per se rule of illegality. *Id.* As the Supreme Court has said,

> Under the Sherman Act a combination formed for the purpose and with the ef-

fect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se.*

*Catalano, Inc. v. Target Sales, Inc., supra,* 446 U.S. at 647, 100 S.Ct. at 1927; *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940).

Buena Vista argues that the split agreements it is challenging should uniformly be declared illegal per se as "price-fixing" because the purpose and effect of all such agreements is to reduce price competition and the terms of licenses paid to distributors for films, and because splits have no redeeming competitive virtues. Pursuant to requests for admission under Fed.R. Civ.P. 36, General Cinema has admitted participating in many splits across the country during the period from September, 1974, until April 1, 1977, when the United States Department of Justice issued a press release stating its intention to challenge splits agreements as per se violations of the Sherman Act. Buena Vista on the present motion seeks a partial summary judgment that all splits in which General Cinema has participated are illegal as a matter of law. It asserts that under the Sherman Act, the licensing of films properly occurs only under competitive conditions, which could take one of the following forms: 1) "competitive bidding," a formal process by which bids are submitted; 2) "competitive negotiations," which do not involve actual bids, but offers made by competing exhibitors are treated as firm like bids; or 3) a residual category of negotiations with exhibitors in a competitive environment, without any conspirato-

---

1. The traditional definition of practices subject to the per se rule is set forth in *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958):

 [T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming value are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. Although the definition literally refers to a "lack of *any* redeeming value," the court be-

 lieves that the real issue, as indicated by the cited language from *Broadcast Music, supra*, is whether the practice may in any way be said to promote competition. "[B]usiness excuse[s]" may provide "redeeming" virtues but they do not lead to the intensification of competitive conditions. Similarly, the Court's reference to a finding that a practice has "no purpose except the stifling of competition," *see White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1962), focuses on the absence of any *procompetitive* purpose. *See* Parts II(A–2) & III(A), *infra*.

rial or practical restraint on the willingness of exhibitors to come forward to negotiate for pictures in which they are interested, or on the distributor's ability to induce offers by approaching selected exhibitors.

General Cinema responds that Buena Vista's motion for partial summary judgment should be denied because splits are properly evaluated under the rule of reason, not the per se rule applicable to price-fixing. It contends that splits provide only a "minimal" restraint, if any, on price competition, and that they have significant benefits for distributors (and exhibitors) which require analysis under the rule of reason. General Cinema additionally claims that Buena Vista's "acquiescence," "consent" and "participation" in splits further establishes that the per se rule is inapplicable, and furthermore that the legality of splits can only be determined on a case-by-case basis at trial.

Buena Vista's renewed motion was first argued on March 30, 1981. By order of April 3, 1981, the court submitted a series of questions to the litigants. Both submitted two sets of briefs in response, along with extensive evidentiary exhibits. Meanwhile, the court granted leave for two film industry groups to participate as *amici curiae*, the National Association of Theatre Owners ("NATO") in support of the exhibitor General Cinema, and eight distributors of motion pictures on behalf of Buena Vista. General Cinema filed its own motion for summary judgment which was denied by the court at a hearing on June 8, 1981. After that date, the parties submitted various additional filings. By order of September 24, 1981, the court submitted a further list of questions to which the parties responded orally at a hearing on September 28, 1981, with the additional submission of lists of relevant citations to the record.

After carefully reviewing and analyzing the entire record connected with Buena Vista's motion for partial summary judgment, the court concludes that it should be granted. The court's reasons are set forth in this opinion, which shall also serve as its findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52. The opinion is divided into five parts. First, the court addresses the standards for granting a motion for summary judgment in antitrust cases. In the next two parts, the asserted anticompetitive and procompetitive effects of splits are analyzed under the relevant caselaw. Part IV addresses General Cinema's contention that distributor participation or consent in splits is material to their legality. Part V concerns General Cinema's contention that a trial must be held in order to determine the legality of splits on a case-by-case basis.

## I. SUMMARY JUDGMENT IN ANTI-TRUST CASES

■ Fed.R.Civ.P. 56(c) states, in relevant part, that "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." It is well-established that the burden is upon the party seeking the judgment to demonstrate the absence of any genuine issue of material fact and that it is entitled to judgment as a matter of law. In examining the record, the court is required to draw all inferences in the light most favorable to the party opposing the motion. *Ron Tonkin Gran Turismo v. Fiat Distributors, Inc.*, 637 F.2d 1376, 1381 (9th Cir. 1981).

■ However, under Fed.R.Civ.P. 56(e), once the moving party has met its burden of going forward by presenting evidence which, taken by itself, would establish the right to a directed verdict at trial, the motion must be granted unless the opposing party introduces "significant probative evidence tending to support his or her theory." *Thi-Hawaii, Inc. v. First Commerce Financial Corp.*, 627 F.2d 991, 993–94 (9th Cir. 1980). Rule 56(e) directs that a party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing

that there is a genuine issue for trial." If the opposing party does not so respond, the Rule states that "summary judgment, if appropriate, shall be entered against him."

The Ninth Circuit has "often noted that summary judgment is not particularly favored in antitrust litigation." *Fiat Distributors, supra,* 637 F.2d at 1381. In a frequently cited passage, the Supreme Court in *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), stated: "We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." The Ninth Circuit has indicated, however, that this passage from *Poller* is not to be used as a "magic wand waived indiscriminately" by those opposing summary judgment motions in antitrust actions. *Thi-Hawaii, supra,* 627 F.2d at 994. The Federal Rules make absolutely no distinction between antitrust and other cases, and use of summary judgment may save a great deal of trial time that might otherwise be consumed by an unnecessary and exhaustive rule of reason inquiry. II P. Areeda & D. Turner, *Antitrust Law* ¶ 316b (1978); *Fiat Distributors, supra,* at 1381. This court believes that partial summary judgment is warranted in this case, as the concerns expressed in *Poller* are considerably less applicable here for three reasons.

First, the Court in *Poller* expressly directed its cautionary comment to cases where motive and intent are critical and the evidence of such is largely controlled by the party bringing the summary judgment motion. Here, the focus is on the objective impact of splits on competition, with relatively little emphasis on subjective motivations. Virtually all of the evidence which General Cinema has used to oppose the motion—*i.e.,* the asserted procompetitive benefits of splits and Buena Vista's alleged consent and participation—has been readily available to it. It has been the moving party Buena Vista, by contrast, which has had to make extensive use of discovery to develop the evidence critical to meeting its

burden of proof on the motion, including evidence as to how and why splits operate. Buena Vista's extensive and essentially unrebutted proof of purpose to suppress competition and to affect terms for licenses is taken entirely from statements by present or former General Cinema employees. Because General Cinema itself is in possession of any evidence relating to motive and intent, there is appropriately far less concern, as compared with *Poller,* about General Cinema's need for cross-examination of hostile witnesses at trial.

Second, the issue of liability in this case turns largely on controlling issues of law. The key facts regarding the nature of splits are not genuinely in dispute. *See* Part II, *infra.* General Cinema, to be sure, has raised a number of factual issues, particularly with respect to possible financial benefits or conveniences to be derived from reducing competition, and the distributors' asserted consent and participation in splits. But to withstand a motion for summary judgment it is simply not enough to refer to disputed factual issues. The factual issues must be *material,* that is, ones which may affect the outcome of the litigation because they are relevant to a viable legal theory. *Fiat Distributors, supra,* 637 F.2d at 1381. Many of the factual issues raised by General Cinema may be material to the extent of damages, but the court believes they are not material to the exclusive concern of the present motion, the issue of liability. *See* Parts II–V, *infra.*

Third, the caselaw supports the granting of partial summary judgment where the per se rule applies. The Supreme Court in *White Motor Co. v. United States,* 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), stated that summary judgments "have a place in the antitrust field, as elsewhere," especially where, as here, the law is "well-developed" and motive and intent are less important than documentary evidence. *Id.* at 259, 83 S.Ct. at 699. In such cases, whether to apply the per se rule can be determined without trial. *Id.* Conspiracies involving restraints on price competition are one such well-developed area of the law.

The Court in *White Motor* reversed that part of the district court's order which pertained to a vertical territorial (nonprice) restriction, stating that "we know too little of the actual impact of both that restriction and the one respecting customers to reach a conclusion on the bare bones of the documentary evidence before us." *Id.* at 261, 83 S.Ct. at 701. But the defendant in that case did not even challenge the price-fixing part of the injunction issued by the district court on summary judgment since, as the Supreme Court noted, "Price-fixing arrangements, both vertical and horizontal, have been held to be per se violations of the antitrust laws; and a trial to show their nature, extent, and degree is no longer necessary." *Id.* at 260, 83 S.Ct. at 700. (citations omitted).

█ A pair of noted scholars in the antitrust field recently stated that summary judgment is appropriate "in many [antitrust] cases," and that "courts are accustomed to granting summary judgment in favor of a plaintiff when the defendant's conduct falls unambiguously within a rule of per se illegality." II P. Areeda & D. Turner, *supra,* ¶ 316a. *See, e.g., Denver Rockets v. All-Pro Management, Inc.,* 325 F.Supp. 1049, 1061, 1065 (C.D.Cal.1971).[2] The court recognizes that characterizing the challenged conduct as falling within or without that category of behavior to which the courts have applied the label "per se illegal price-fixing" will "often, but not always, be a simple matter." *Broadcast Mu-*

sic, Inc. v. CBS, Inc., *supra,* 441 U.S. at 9, 99 S.Ct. at 1557.[3] In this case, however, the court finds, for the reasons now to be stated, no genuine issue of material fact as to the applicability of the per se rule against price-fixing to the split agreements at issue, and therefore concludes that Buena Vista is entitled as a matter of law to partial summary judgment on the issue of liability.

## II. ANTICOMPETITIVE NATURE OF SPLITS

### A. Operation and Purpose of Splits

#### 1. Nature of "first rights of negotiation."

Both parties agree that splits have operated a little differently from area to area across the country, especially with respect to the mechanics of allocating the first rights of negotiation among split members. In some splits, the rights are parcelled out picture-by-picture; in others, the right to negotiate for films is distributed to participating exhibitors on a company-by-company basis, so that a designated exhibitor negotiates for all of a distributor's upcoming pictures. In still other splits, rights may be allocated to a "track" (a group of theaters in various areas of a market), either on a picture-by-picture or a company-by-company basis. After carefully reviewing the record, however, the court has come to the conclusion that all splits by definition have at least one critical anticompetitive characteristic in common—an agreement or

**2.** Summary judgment for plaintiff may even be granted where the rule of reason applies, if the challenged practice is so patently unreasonable that no genuine issue remains for trial. *See, e.g., Kapp v. National Football League,* 390 F.Supp. 73, 82, (N.D.Cal.1974), *aff'd on other grounds,* 586 F.2d 644 (9th Cir. 1978), *cert. denied,* 441 U.S. 907, 99 S.Ct. 1996, 60 L.Ed.2d 375 (1979).

**3.** *State of Arizona v. Maricopa County Medical Society,* 643 F.2d 553 (9th Cir. 1980), does not preclude the granting of a partial summary judgment in this case. In *Maricopa County* plaintiff challenged the actions of two foundations for medical care in setting maximum fees that physician members may claim in full payment for health services they provide to policyholders of foundation-approved insurance

plans. The Ninth Circuit affirmed the district court's denial of summary judgment, declining on that motion to declare the practice per se illegal price-fixing. However, in contrast to the extensive record developed here, the record in *Maricopa County* "reveal[ed] nothing about the actual competitive effects of the challenged arrangement nor do the authorities, primary or secondary, afford assurance concerning its competitive impact." *Id.* at 556–57. The court also premised the decision on its uncertainty about the structure of competition that should exist within the health care industry in view of the fact that the professions have only recently been brought by the Supreme Court within the reach of the Sherman Act. *Id.* at 556, 560 (Kennedy, J., concurring).

understanding by exhibitors participating in the split to refrain from competing against the split designee while its right or opportunity to negotiate continues.

At the September 28, 1981, hearing, counsel for General Cinema confirmed that such an agreement not to compete is characteristic of all splits. The court in its order of September 24, 1981, posed the issue of whether all splits have any fundamental similarities in the context of the district court's description of splits in *Cinema-Tex Enterprises, Inc. v. Santikos Theaters, Inc.*, 414 F.Supp. 640, 641–43 (W.D.Tex.1975), *aff'd in part and rev'd in part on other grounds*, 535 F.2d 932 (5th Cir. 1976). The *Cinema-Tex* court found that "[i]nstead of submitting and providing a cash guarantee to the distributors for first-run films," exhibitor members of a split would divide among themselves the opportunity to negotiate the terms of exhibition of the films "without interference from others in the

split." 414 F.Supp. at 641 n.7.[4] Counsel for General Cinema agreed that this description of splits was accurate, stating that "a split involves the opportunity to negotiate the terms of an exhibition license with the distributor without interference from others who wish to participate in the split." Transcript at 14.[5] Counsel did not attempt to explain away or distinguish the stipulated definition of splits that General Cinema entered into in *Wilder Enterprises, Inc. v. Allied Artists Pictures Corp.*, 632 F.2d 1135 (4th Cir. 1980), that a split is an "agreement whereby ... exhibitors agreed to refrain from competing against each other for licenses," *see* Buena Vista Appendix (April 27, 1981), at 214.

That splits inherently provide that participating exhibitors are not to compete against the exhibitor who has been assigned the rights of negotiation is corroborated by the briefs of the parties[6] and the uncontra-

4. The district court in *Cinema-Tex* made three additional findings regarding splits that also do not appear to be contested on the present record: 1) that the split could not guarantee that any exhibitor would ultimately be able to license a particular film since the final decision on licensing rested with the distributors; 2) split agreements did not require distributors to deal only with split members, or to forego the right to solicit bids from any exhibitors; and 3) that the exhibitors could have ended the split at any time by responding to invitations to bid from the distributors. 414 F.Supp. at 642–43. The legal significance of these aspects of split agreements will be analyzed in Section B of this Part of the opinion.

It is significant to note that in spite of the above qualifications on the restrictiveness of splits, the court in *Cinema-Tex* found that distributors could deal only with the exhibitor who was awarded the picture in the split unless negotiations with that exhibitor were "non-productive" and therefore the distributor was able to solicit bids from other exhibitors. *Id.* at 643. It is also worthy of note that testimony in the case disclosed that splits originated out of the dissatisfaction of exhibitors with the competitive bidding process, particularly the "large cash guarantees which the exhibitors were required to put up to get pictures." *Id.* at 641–42.

5. Counsel for General Cinema emphasized, however, that the *Cinema-Tex* findings were incomplete in that they did not include participation by the distributors. Indeed, the *Cinema-Tex* court found that distributors were not part

of the split and continued in spite of the split to solicit bids which were ignored by the exhibitor members of the split. *Id.* at 642. The impact on the legality of splits of distributor participation or consent will be discussed in Part IV of the opinion.

6. General Cinema does not directly address this point in its briefs, even though it was squarely raised by Requests IA and IB of the court's order of April 3, 1981. General Cinema makes substantial efforts to demonstrate the "flexibility" and lack of "rigidity" in split arrangements, but makes no direct denial in either their voluminous briefs or evidentiary packets of the proposition that all split agreements contemplate that members of the split will refrain from competing with the split designee for a particular picture while the designee continues to seek a license. For example, on pages 24 and 25 of its April 28, 1981, brief, General Cinema asserts that "Splits may co-exist with bidding. For example, in Milwaukee, Wisconsin, some exhibitors are splitting product at the same time that General Cinema bids for pictures [Michael Decl. (Tab Y) ¶ 8]. Clearly in this type of situation, no distributor could argue it was ever forced to deal with a split designee against its wishes." But the Michael Declaration to which the passage refers merely indicates that splits do not always include all exhibitors in a given area. Thus, General Cinema's argument, as elsewhere in its briefs, serves to obscure but not deny the restraint on competition that is central to all splits.

dicted evidence in the record. Numerous employees or former employees of General Cinema testified in depositions that they simply would not respond at all to invitations from distributors to bid for pictures that had been assigned to other members of the split. There is also undisputed evidence that when mistakes or misunderstandings arose resulting in more than one split member negotiating for the same picture, the split would reconvene and reallocate rights of first negotiation so that the interference in the opportunity of the split designee would be eliminated.

The presence in splits of agreements not to compete with the split designees is also clear from discussions of splits by the Ninth Circuit. In *Syufy Enterprises v. National General Theatres, Inc.*, 575 F.2d 233, 234 (9th Cir. 1978), for example, the court stated that in both company and picture splits the participants agree that a member thereof shall have the right to negotiate with the distributor for one or more pictures "prior to any other members doing so." In *Twentieth Century Fox Film Corp. v. Goldwyn*, 328 F.2d 190 (9th Cir.), *cert. denied*, 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87 (1964), the court described splits as "agreements entered into ... with competitive exhibitors not to compete in the licensing of films." *Id.* at 198. The court added that where splits occur, "there is either no competitive bidding or it is subject to being circumvented by fake bidding or abstention of bidders," although this "first opportunity to negotiate" did not include an agreement that if the first negotiation failed the other exhibitors were foreclosed from negotiating for the picture or pictures. *Id.* at 205–06.

### 2. *Purpose of splits.*

The record contains compelling evidence that splits are formed for the purposes of suppressing price competition and affecting price, one of the hallmarks of a per se illegal price-fixing arrangement. Only a few highlights of the testimony presented by both Buena Vista and General Cinema on this point will be noted here.

D. Barry Reardon, for example, General Cinema's former Vice-President in charge of all of the firm's film buying, could hardly have been clearer when he testified in his deposition that "usually in a split the purpose of getting together is hopefully that you would be able to buy the picture at lesser terms and hopefully less of a guarantee or advance than the distributor is requesting on the particular picture." Buena Vista Appendix (April 27, 1981), at 83. He went on to say that, "We would be interested in participating in a split in any town where there was excessive bidding and high guarantees." *Id.* at 84. Former General Cinema buyer Ennis Adkins was equally frank at his deposition:

Q: What was your purpose or what were you trying to accomplish, Mr. Adkins, by setting up the split, as you referred to it?

A: We didn't want to put up guarantees and we didn't want to pay the terms brought on by bidding against one another.

Q: So by splitting you were able to eliminate guarantees?

A: Correct.

*Id.* at 6–7.

In addition to General Cinema's stipulation in another action that splits are agreements whereby "exhibitors agreed to refrain from competing against each other for licenses," counsel for General Cinema, Harry B. Swerdlow, earlier in this action stated the following with regard to the origin of split agreements:

... they say to each other, "Look, bidding is a very destructive process. We will drive ourselves out of business and just enrich the film companies ... So we'll divide companies' pictures between us."

Remarks of H. B. Swerdlow, at Hearing on Nov. 2, 1979, *quoted in* Buena Vista Statement of Fact and Law (April 27, 1981), at 26.

General Cinema makes no genuine effort to rebut these and other statements by former and current General Cinema officials and employees, but contends that they are

"isolated" comments taken out of context which show only that *one* of the purposes of splits has been to reduce price competition. However, General Cinema's limited efforts to show the full context of certain of the statements made serve only to make more clear the anticompetitive nature of splits. *See* General Cinema's May 11, 1981, Memorandum, at 7–15. As discussed in Part III of this opinion, none of the alleged alternative purposes mentioned in the additional testimony recited is genuinely procompetitive.

For example, former General Cinema Vice-President Reardon explained that there "can be" measurable benefits to distributors from the "orderly distribution" of motion pictures. But like other references to "competitive evils," permitting "orderly distribution" to be a defense to an agreement among competitors to limit their competition is "wholly alien to a system of free enterprise." *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 220–21, 60 S.Ct. 811, 842–43, 84 L.Ed. 1129 (1940). General Cinema also characterizes as "grossly misleading" Buena Vista's quotation of former General Cinema film buyer Corliss Lewin's statement that free and open competition was "self-destructive." The lengthy addition to her remarks primarily indicates that splits help obtain "an orderly sequence" of pictures and have "enabled exhibitors to avoid commitments of lengthy film playing times," neither of which involve the promotion of competition. General Cinema also seeks to put "in context" the admission by its President, Richard A. Smith, that the direct and natural effect of splits is to lessen the amount of film rental received by distributors. The additional quotations say little more than Smith's observations that splits benefit all parties involved because they make the operations of theaters "a simpler, less complex matter," as compared with bidding, which is "apt to be more chaotic."

### 3. Splits as allocating "exclusive rights of negotiation."

In light of several statements by General Cinema personnel of a purpose to suppress all competition without qualification, Buena Vista asserts vigorously that splits in reality provide an "exclusive" right as opposed to merely a "first" right of negotiation. It provides significant uncontradicted evidence of conspiratorial and practical restraints on the competition by split members that go beyond the refraining from any interference during the pendency of negotiations with the split designee. This evidence includes the following: 1) when one or more split designees are rejected by distributors and there is a shortage of quality films available, the split reconvenes and reallocates rights of negotiation; 2) where there is a surplus of quality films available, a distributor which rejects the split designee finds that the other exhibitors are already booked up for the period during which it wants the picture played; and 3) members of the split agree to refrain from competing with the designees for a certain period of time (which may last beyond the point at which the split designee is definitively rejected by the distributor), or agree to refuse to deal entirely with the distributor with respect to the picture or pictures allocated to the split designee.

Although this evidence leaves little doubt that splits provide incursions into competition beyond the point of rejection of the split designee, factual questions remain as to the frequency with which splits eliminate *entirely* the competition for licenses by participating exhibitors. Therefore, the court declines on the present record to adopt Buena Vista's characterization of splits as providing "exclusive" rights of negotiation. The legal consequence of this is to render less applicable the market division theory for making splits illegal per se—asserted as an alternative to the price-fixing theory by the Justice Department in several documents inserted into the record—since splits arguably would not constitute illegal per se market divisions unless they eliminated *all* competition in a given area for specified films. *See United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *United States v. Koppers Co., Inc.*, 652 F.2d 290 (2d Cir. 1981).

However, the court does not believe, as the legal analysis of splits in the next section shows, that proof of exclusive rights to negotiate is a prerequisite for establishing the per se illegality of splits under the price-fixing theory on which Buena Vista now relies entirely.

### B. Analysis of Splits under Supreme Court Caselaw

General Cinema points to five distinct aspects of splits in an attempt to minimize the extent to which splits appear to restrain competition: 1) Split members do not directly fix the terms for licenses that they will offer or even agree upon a guideline for terms to be offered; 2) Some splits do not include all exhibitors in a given area; 3) Members are free to leave the split and resume competition; 4) Splits do not force distributors to license their pictures to theaters not of their choice; and 5) Splits do not preclude distributors from seeking out alternative exhibitors once negotiations have broken down with the split designee.

Relying on these caveats to the fundamental agreement not to compete to establish the "extremely flexible" nature of splits and their "very minimal inhibition" on competition, General Cinema and amicus curiae NATO urge the court to apply the rule of reason on the authority of *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) (hereinafter referred to as *Broadcast Music* or *BMI*). If proven, the five aspects of splits emphasized by General Cinema may provide some basis for dimin-

ishing a damage recovery, but the fact that splits may not always present "an absolute ban" on *all* competition for film licenses does not preclude their per se illegality. The court agrees with Buena Vista that splits are so "plainly anticompetitive" as to properly be declared per se illegal on this motion on the authority of *National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978) (hereinafter referred to as *National Society or NSPE*); *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980); and *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

#### 1. Absence of "direct" price-fixing.

■ General Cinema argues that the per se rule is inappropriate because split members do not literally "fix" prices and therefore Buena Vista's price-fixing theory is only "indirect," not "direct." However, the law is clear that a direct effect is not a prerequisite for application of the per se rule. In *National Society*, for example, there was no claim that the defendant organization had tried to fix specific fees or even a specific method of calculating them, 435 U.S. at 682, 98 S.Ct. at 1360, yet the challenged ethical rule was held illegal per se without elaborate analysis of procompetitive benefits. *Id.* at 692, 98 S.Ct. at 1365.[7]

■ In *Catalano, Inc. v. Target Sales, Inc., supra*, 446 U.S. at 647–48, 100 S.Ct. at 1927–28, the Court cited *United States v. Socony-Vacuum Oil Co., supra*, in which the Court had held that an agreement among

7. The Supreme Court in *National Society* did not expressly relate its holding to the per se prohibition of price-fixing, but this court believes that a number of factors compel the conclusion that the per se rule, and not rule of reason analysis, was applied in that case. Both the district court and the D.C. Circuit relied on the per se illegal price-fixing theory, *see* 555 F.2d 978, 983 (D.C.Cir.1977), and the Supreme Court borrowed language from the lower courts that is indicative of the per se rule, such as, for example, that the practice is "illegal on its face," *see* 435 U.S. at 686, 692–93, 98 S.Ct. at 1362, 1365–66. Even though the district court after a trial made a number of detailed findings about the defendant Society and the

challenged ethical rule, it expressly refused to undertake a factual inquiry into the Society's proffered justifications for the practice, and therefore did not balance anticompetitive and procompetitive effects to determine the "reasonableness" of the restraint. *Id.* at 685–86, 98 S.Ct. at 1362. The Supreme Court approved the district court's refusal to examine the asserted benefits under the rule of reason. *Id.* at 693–96, 98 S.Ct. at 1366–67. In addition, the Court's subsequent decision in *Catalano, supra*, strongly suggests, if not explicitly states, that *National Society* involved an application of the per se rule. 446 U.S. at 645–48, 100 S.Ct. at 1926–28.

competitors to engage in a program of buying surplus gasoline on the spot market in order to prevent prices from falling sharply was unlawful without any inquiry into the reasonableness of the program, even though there was no "direct" agreement on the actual prices to be maintained. As the *Socony* Court noted, "the machinery employed by a combination for price-fixing is immaterial," 310 U.S. at 223, 60 S.Ct. at 844, *quoted at* 446 U.S. at 647, 100 S.Ct. at 1927. The *Catalano* Court added that "we have held agreements to be unlawful per se that had substantially less direct impact on price than the agreement alleged in this case," citing as examples *National Society, supra,* and *Sugar Institute v. United States,* 297 U.S. 553, 601–02, 56 S.Ct. 629, 80 L.Ed. 859 (1936). Numerous other authorities make clear that the per se rule against price-fixing applies even when the effect on prices is "indirect," as the price-fixing rule is directed at all restraints on competition that affect pricing mechanisms. *See, e.g., United States v. Container Corp.,* 393 U.S. 333, 337, 89 S.Ct. 510, 512, 21 L.Ed.2d 526 (1969); *Simpson v. Union Oil Co.,* 377 U.S. 13, 16–22, 84 S.Ct. 1051, 1054–57, 12 L.Ed.2d 98 (1964); *Plymouth Dealers' Ass'n v. United States,* 279 F.2d 128, 132 (9th Cir. 1960); L. Sullivan, *Antitrust* § 73, at 197–98.

### 2. *Exclusion of some exhibitors.*

General Cinema argues that some competition for licenses often continues to exist notwithstanding the split agreement because the split may not include every exhibitor in the area. There is evidence in the record that splits attempted to include as members all theaters in the relevant local market that represented a competitive threat to the split. But more importantly, it has been clear since *Socony-Vacuum, supra,* that an agreement whose purpose is to suppress competition will be held illegal regardless of the power of the conspirators to carry out their design to the fullest extent possible. L. Sullivan, *supra,* § 70, at 192. As the Court in *Socony-Vacuum* stated:

It is the "contract, combination . . . or conspiracy in restraint of trade or com-

merce" which § 1 of the [Sherman] Act strikes down, whether the concerted activity be wholly nascent or abortive on the one hand, or successful on the other . . . Price-fixing agreements may or may not be aimed at complete elimination of price competition. The group making those arrangements may or may not have power to control the market. But the fact that the group cannot control market prices does not necessarily mean that the agreement as to prices has no utility to the members of the combination . . . Only a confusion between the nature of the offenses under those two sections [§ 1 and § 2 of the Sherman Act] . . . would lead to the conclusion that power to fix prices was necessary for proof of a price-fixing conspiracy under § 1.

310 U.S. at 225–26 n.59, 60 S.Ct. at 845–46 n.59. In *National Society,* for example, the fact that membership in the Society subject to its ethical rules accounted for slightly less than 10 percent of all graduate engineers in the nation holding a collegiate degree in engineering did not make the anticompetitive effect of the rules on the membership any less objectionable. *See* 389 F.Supp. at 1195. That not all exhibitors in a given area do not participate in a split may lessen the effectiveness of the split in reducing license terms, but does not have any bearing on the legality of the split agreement.

### 3. *Freedom to cease participation in the split.*

General Cinema argues that exhibitors who are members of a split remain "free" to seek to bid or negotiate for pictures of their choice. The record indicates that the enforcement of agreements not to compete by the exhibitors is relatively lax. Splits do not tend to remain in effect for long periods of time because exhibitors who are dissatisfied with the amount or quality of films allocated to them leave the split and seek films through competition.

However, courts have not held strict enforcement to be a critical factor in determining the per se illegality of a price-fixing

agreement. *NSPE, supra*, 389 F.Supp. at 1200; L. Sullivan, *supra*, § 82, at 226. The Supreme Court has condemned several arrangements which had lax or casual enforcement. *See, e.g., United States v. Container Corp., supra*, 393 U.S. at 337 & n.3, 89 S.Ct. at 512 & n.3; *American Column & Lumber Co. v. United States*, 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284 (1921). As the Court stated in *Socony-Vacuum, supra*, "*Any* combination which tampers with price structures is engaged in an unlawful activity." 310 U.S. at 221, 60 S.Ct. at 843 (emphasis added).

The court notes that all conspiracies last only so long as the individual conspirators believe their interests are served. As Buena Vista argues based upon evidence in the record, it may not make sense for split members to attempt to punish an exhibitor who engages in unauthorized competition with the split designee for a particular picture, since the sanction of exclusion from the split in the future would only enhance the competitive threat to the effectiveness of the split. Thus, the main enforcement device, according to uncontradicted testimony, is the effort to hold splits together by the power of persuasion—through explicit warnings by the split "captain" to the membership of the dangers of "ruinous competition" if the split does not continue intact. *See* Buena Vista Statement of Fact and Law (April 27, 1981), at 17–20. Under these circumstances, surely the court must remain concerned with the anticompetitive purpose and effect generated by split members to the extent that they do participate in the split.

### 4. *Freedom to license to theaters of choice.*

General Cinema asserts that splits under no circumstances preclude distributors from licensing their pictures to theaters of their choice. A distributor, of course, has the final decision regarding the exhibitor to which it will license each picture; members of a split cannot absolutely guarantee to the designee that the distributor will be willing to license to it.

Buena Vista disputes General Cinema's claim with evidence that splits do not always permit distributors to license to the theater of their choice. In any case, General Cinema's assertion has little to do with the intensification of price competition. Indeed, the method by which General Cinema claims the result is achieved—trades among the split participants to satisfy the needs and desires of the distributors—adds to rather than lessens the anticompetitive nature of splits. By these trades exhibitors refrain from competing with each other rather than permitting the licensing process to be opened up to competition once a distributor makes clear that it is not interested in licensing to the split designee. Thus, whether "reallocation works out" may be relevant to the extent of harm done to a distributor in damages, but has no relevance to whether or not the per se rule should be applied.

### 5. *Competition after rejection of split designee.*

General Cinema asserts that distributors are "not precluded" by splits from seeking out alternative exhibitors once negotiations have broken down with the split designee. As noted above in Section A–3, the record is not clear as to the extent of the practical or conspiratorial barriers to negotiations with a second member of the split, let alone with two or more members in competition, after rejection of the split designee. But even if in some splits there was full competition after rejection of the split member holding the first right of negotiation, these splits would still present a substantial restraint on price competition under the strong authority of *National Society of Professional Engineers v. United States, supra*.

### a. *National Society.*

In *National Society* the Court struck down the ethical canon of the National Society of Professional Engineers which prohibited its members from negotiating or even discussing the question of fees until after a prospective client had "selected" the engineer member for a particular project on

nonprice grounds including background and reputation. 435 U.S. at 683–84, 98 S.Ct. at 1361. Although the Court referred to this provision as an "absolute ban" on competitive bidding, *id.* at 692, 98 S.Ct. at 1365, it is important to note that the rules did not prohibit all price competition. The simultaneous submission of bids was prohibited, but a form of serial competition could take place. The prospective clients in National Society, like the distributors here, had a choice of whether to accept or reject the contract terms negotiated with the engineer. Society members were permitted to quote prices after they had been "selected," and the ethical rules raised no barrier to the customer's right to withdraw his selection and approach another engineer. *Id.* at 684 & n.6, 98 S.Ct. at 1361 & n.6.

Here, there are also no price considerations involved in the process of selecting the split member for the initial negotiation, but for a different reason. The elimination of price competition in the initial selection process occurs because *all* forms of competition, including those not based on price, are eliminated as far as the distributors are concerned. The competition for the initial rights of negotiation occurs solely within the confines of the split meetings. When the split designee makes an offer, the distributor has to decide, based on such factors as grossing potential of the theater,[8] whether to accept it, without the present ability to compare offers from the other exhibitors who are participating in the split. Indeed, because of the possibilities of reallocation (eliminating simultaneous competition in the future), a refusal to deal by other members of the split, or an inability of those exhibitors to deal because of prior bookings, the distributor may face more pressure to arrive at an agreement with its initial negotiating partner than did the prospective client in *National Society.*

If it is willing to take the risk, the distributor, like the client in *National Society,*

may over time compare offers by rejecting the split designee and moving on to a second negotiation, or perhaps even to a period of free competition. But the Court in *National Society* clearly stated that this limited form of competition did not preclude the arrangement from being declared illegal on its face. The Society argued that its canons permitted price competition once an engineer had been initially selected, and therefore the provisions were only an incidental restraint of trade because they merely regulated the timing of competition, as in *Chicago Board of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), where the Court upheld an exchange rule which forbade exchange members from making purchases after the close of the day's session at any price other than the closing bid price. The Court squarely rejected this argument, stating that the Society's claim "mistakenly treats negotiation between a single seller and a single buyer as the equivalent of competition between two or more potential sellers." 435 U.S. at 693 n.19, 98 S.Ct. at 1366 n.19. In addition, the Court noted that the district court's findings precluded the possibility of finding a positive effect on competition, which was the basis for upholding the exchange rule in *Chicago Board of Trade* under the rule of reason. Justice Blackmun's concurring opinion also finds the opportunity for simultaneous competition to be of critical importance in language that is especially pertinent here:

> To secure a price estimate on a project, the client must purport to engage a single engineer, and so long as that engagement continues no other member of the Society is permitted to discuss the project with the client in order to provide comparative price information. Though § 11(c) does not fix prices directly, and though the customer retains the option of rejecting a particular engineer's offer and beginning negotiations all over again

---

8. The Eighth Circuit in *Admiral Theatre Corp. v. Douglas Theatre Co.,* 585 F.2d 877, 885 (8th Cir. 1978), describes grossing potential of a theater as "[t]he most important factor in licensing a film." A theater's location, quality of

furnishings, seating capacity, demonstrated ability to attract patrons, and the type of films previously shown are factors considered by a distributor in determining grossing potential. *Id.*

with another engineer, the forced process of sequential search inevitably increases the cost of gathering price information and hence will dampen price competition. 435 U.S. at 700, 98 S.Ct. at 1369.

■■■ Thus, in *National Society* the competitive evil was the elimination of concurrent price comparisons. *Id.* at 683–84, 692–93, 695, 98 S.Ct. at 1361, 1365–66, 1367. Splits are clearly designed to achieve the same objective in a purely commercial context, at least for as long as the split designee has a chance to successfully negotiate a license. To the extent that the suppression of price in *National Society*, where the Court referred to no evidence of actual purpose and effect presumably because these elements were self-evident, *see* 435 U.S. at 685–86, 692, 98 S.Ct. at 1362, 1365, the court notes that Sections A–2 and C of this Part of the Opinion conclusively establish such anticompetitive purpose and effect. As did the negotiations process in *National Society*, the "rights of first negotiation" provided by split agreements "substantially deprive" distributors of "the ability to utilize and compare prices" in licensing their pictures. *See id.* at 692–93, 98 S.Ct. at 1365–66. Thus, the court concludes, "the nature and necessary effect" of splits is "so plainly anticompetitive" that no "elaborate industry analysis" is required to demonstrate their anticompetitive character. *Id.* at 692, 98 S.Ct. at 1365. *Accord, United States v. Swift & Co.*, 52 F.Supp. 476 (D.Colo.1943) (held per se illegal under *Socony-Vacuum* an agreement whereby four purchasers of fat lambs were given initial rights to negotiate for various groups of lambs; if unsuccessful, each would pass along sequentially to the others the right to negotiate until all four had exhausted their series of rights, after which the remaining lambs were opened up to competitive bidding by all). *Cf. United States v. Champion International Corp.*, 557 F.2d 1270 (9th Cir.), *cert. denied*, 434 U.S. 938, 98 S.Ct. 428, 54 L.Ed.2d 298 (1977) (an "understanding" about refraining from bidding between two purchasers of timber lots held per se illegal as price-fixing or market division).

b. *Broadcast Music.*

Neither General Cinema nor amicus curiae NATO provides any persuasive basis for distinguishing *National Society*, relying instead on the more recent *Broadcast Music* decision as controlling. In that case, plaintiff CBS challenged as per se illegal price-fixing the issuance of blanket licenses to copyrighted musical compositions by two organizations, the American Society of Composers, Authors and Publishers (AS-CAP) and Broadcast Music, Inc. (BMI). Blanket licenses give the licensees the right to perform for a set price any and all of the compositions owned by members or affiliates of ASCAP and BMI as often as the licensees desire during a stated term. The Supreme Court reversed the judgment for CBS, ruling that the legality of blanket licenses could not be determined under the per se rule even though the practice seemed to involve "price-fixing" in a literal sense. 441 U.S. at 8–9, 99 S.Ct. at 1556–57. On remand, the Second Circuit, without even employing the rule of reason analysis, upheld blanket licenses as lawful because there was no genuine restraint on competition. *CBS, Inc. v. ASCAP*, 620 F.2d 930 (2d Cir. 1980). The court concluded that the blanket license system could easily have been circumvented by attempting to negotiate directly with the owners of the copyrights. Since the opportunity to purchase performing rights directly is "fully available," the Second Circuit concluded that "it is customer preference for the blanket license, and not the license itself, that causes the lack of price competition among songs." *Id.* at 935.

General Cinema and NATO assert that the opportunity to reject the split designee and solicit offers from other split members is "fully available," so that splits similarly do not restrain trade at all, or in the alternative are such a minimal restraint on competition that they must be analyzed under the rule of reason. The court cannot agree, as it finds *Broadcast Music* to be distinguishable on two important grounds.

First, there was no evidence whatsoever in *Broadcast Music* of an anticompetitive purpose, nor was there a facial effort by competitors to restrain competition. To the contrary, the Supreme Court found strong, perhaps even compelling, procompetitive purposes behind the system of blanket licensing. The Court noted that the system originated because those who performed copyrighted music were so numerous and widespread, and most performances so fleeting, that "as a practical matter it was impossible for the many individual copyright owners to negotiate with and license the users and to detect unauthorized uses." 441 U.S. at 5, 99 S.Ct. at 1554. Thus, the Court suggested that blanket licensing was "reasonably necessary" to the continued existence of the commerce anticipated by congressional enactment of the Copyright Act. *Id.* at 19, 99 S.Ct. at 1562. Because of the "prohibitive" costs involved, "[a] middleman with a blanket license was an obvious necessity if the thousands of individual negotiations, a virtual impossibility, were to be avoided." *Id.* at 20, 99 S.Ct. at 1562. The Court added that ASCAP is not "a joint sales agency offering the individual goods of many sellers," because the blanket license is to some extent "a different product" from that which individual copyright holders could offer in competition with each other. It has certain "unique" characteristics, including resources for blanket sales and enforcement, great latitude in the choice of musical material, and the allowance of the immediate use of covered compositions without the delay of prior individual negotiations. *Id.* at 21–22, 99 S.Ct. at 1563.

By contrast, the anticompetitive purpose of splits is manifest. Unlike the blanket license, a split can properly be referred to as a "horizontal arrangement among competitors," *see id.* at 23, 99 S.Ct. at 1564, and there are no genuine, let alone compelling, procompetitive justifications for the arrangement. *See* Part III, *infra.*

Second, in *Broadcast Music*, the Supreme Court noted that the district court had found that there was "no legal, practical, or conspiratorial impediment to CBS's obtaining individual licenses; CBS, in short, had a real choice." 441 U.S. at 24, 99 S.Ct. at 1564. Here, by contrast, there is no question that splits present "practical" and "conspiratorial" impediments to competition among exhibitors participating in a split. Even if the distributor summarily rejects the split designee and then faces open competition for licensing the film—a scenario which clearly is not available to the distributors in all splits because of reallocations, full bookings or refusals to deal by the other members of the split—a significant diminution of price competition occurs because the split designee is no longer involved in the process. General Cinema emphasizes repeatedly the extent to which split participants attempt to satisfy the distributors' interest in particular theaters in making their allocations. Indeed, several General Cinema witnesses readily acknowledge that reallocations of rights of negotiation occur for the purpose of matching the allocations with distributor desires. Clearly, the better the split participants do at designating exhibitors that the distributors want for particular pictures, the more effective the split is at suppressing price competition. The supposed "freedom" to reject the designee and seek other exhibitors is a small consolation to the distributor if the split designee happens to have the theater that the distributor wants from a grossing standpoint, and the split blocks all competitive pressure from participating exhibitors until and unless the designee is rejected.

One cannot say, as in *Broadcast Music*, that competition by exhibitors is "fully available" to distributors in split situations and that distributors retain "unimpaired independence" in the licensing of films. 620 F.2d at 935–36. *Broadcast Music* neither expressly nor impliedly limits the application of *National Society* to the restrictions on competition inherent in splits. Aside from several passages cautioning courts to be careful in the use of per se rules, *Broadcast Music* has little relevance to the legal analysis of splits.

## C. *Evidence of Anticompetitive Effect*

■ Buena Vista makes a strong argument that it is not necessary to consider

evidence of anticompetitive effect in this case in view of the "nature and necessary effect" of splits, see *NSPE, supra*, at 692, 98 S.Ct. at 1365, and the evidence of purpose to affect license terms and suppress competition. Where the restraint on price competition is a very obvious one, a practice may be deemed per se illegal even without any evidence of a purpose or effect to suppress competition. *See, e.g., Catalano, supra*; *United States v. Koppers Co., Inc.*, 652 F.2d 290, 296 (2d Cir. 1981). It can be argued that the anticompetitive purpose and effect are self-evident with regard to splits and that in any case the requisite effect may be presumed from the clear intent to achieve ends that are condemned by the antitrust laws. *See, e.g.*, L. Sullivan, *supra*, § 71, at 194–95. However, because this litigation concerns splits all across the country and because splits have never before been held to be per se illegal price-fixing, the court believes it would be useful to analyze the evidence in the record of anticompetitive effect. *See Broadcast Music, supra*, 441 U.S. at 19, 99 S.Ct. at 1562 (per se inquiry must focus on effect); *Gough v. Rossmoor Corp.*, 585 F.2d 381, 388 (9th Cir. 1978) (additions to per se rule require evidence supporting determination of pernicious effect on competition). The court's analysis of effect is divided into three parts: 1) the effect on pricing mechanisms under relevant caselaw; 2) the admissions of effect on competition and price by current and former employees of General Cinema; and 3) the theater comparisons offered by Buena Vista for split and nonsplit situations.

### 1. *Effect on pricing mechanisms.*

■ The law ultimately focuses on the effect of a practice on competition, not simply on the actual effect on prices. *United States v. NSPE, supra*, 555 F.2d at 981 n.3; *Plymouth Dealers' Ass'n v. United States*, 279 F.2d at 132; L. Sullivan, *supra*, § 74, at 202. *But cf. State of Arizona v. Maricopa County Medical Society*, 643 F.2d 553, 556 (9th Cir. 1980) (inquiry into actual effect on price essential where defendant's asserted procompetitive defense is that the challenged practice is designed to lower prices

rather than to serve as a ceiling which tends to raise prices). Rather than examining the effect on price, the District of Columbia Circuit in *National Society*, citing *Kiefer-Stewart Co. v. Seagram & Sons*, 340 U.S. 211, 213, 71 S.Ct. 259, 260, 95 L.Ed. 219 (1951), stated: "What is of critical significance is that the agreement among defendant's members to refrain from competitive bidding is an agreement to restrict the free play of market forces from determining price." 555 F.2d at 981 n.3. The Supreme Court in *NSPE* noted that price is the "central nervous system of the economy," and that an agreement that "interfere[s] with the setting of price by free market forces" is "illegal on its face," as is one that "impedes the ordinary give and take of the market place," 435 U.S. at 692, 98 S.Ct. at 1365. *Accord, Socony-Vacuum, supra*, 310 U.S. at 221, 60 S.Ct. at 843 ("Any combination which tampers with price structures is engaged in an unlawful activity.").

The evidence in the record regarding the nature of splits makes obvious that split arrangements, as did the ethical rules in *National Society*, "bloc[k] the free flow of price information" and competitive offers, *see* 555 F.2d at 981, and thus interfere with the price mechanism on which our society depends as the means of properly allocating resources.

### 2. *Testimony regarding effect.*

While at General Cinema, Vice-President D. Barry Reardon prepared a document for presentation to high-ranking Walt Disney Productions and Buena Vista personnel in which he estimated that the "Gain to Disney on Elimination of Splits" amounted to $1,935,000 on only six major releases. In his deposition, Reardon indicated that his purpose was to show "what an exceptional customer General Cinema has been" to the Disney organization, and also how General Cinema's asserted termination of its participation in splits since the Justice Department press release of April, 1977, had "affected General Cinema's film payments to Disney." Buena Vista Appendix (April 27, 1981), at 76. Melvin R. Wintman, Execu-

tive Vice-President in charge of General Cinema's Theatre Division stated publicly:

With the elimination of splitting, competition for pictures is going to become considerably more intensive. Pictures will, for a time, cost more. Unfortunately, for the small exhibitor who advocated the elimination of splits, he's not going to be in a better position. He is now going to be bidding against everyone in the marketplace for product. Those theaters with the best grossing capacity will continue to get product, because they will be able to pay higher rentals and guarantees and, therefore, offer the highest film rentals to the distributor.

Buena Vista Appendix (April 27, 1981), at 232.

As with respect to the testimony regarding purpose, General Cinema provides scant rebuttal or explanation of the above statements as well as additional similar testimony by current or former General Cinema employees. Other than to rely on its theories, discussed in the next section, that all damage to Buena Vista was "voluntarily self-inflicted" and that on balance, splits may enhance rather than lessen Buena Vista's total revenues because splits tend to steer distributors to the theaters they want, General Cinema's only response to the effect testimony is to emphasize the "hypothetical" nature of the bid situations in Reardon's report. That, of course, is an important point to make at trial regarding the extent of damages, but it in no way undercuts the impact of Reardon's assertion that splits have had substantial effects not only on the terms of licenses but on the total revenues paid to Buena Vista.

3. *Comparisons of split and nonsplit situations.*

Buena Vista has also submitted a considerable volume of information in an attempt to compare the terms received under bidding and splitting situations in comparable theaters and locations. The evidence is clear that bidding results in substantially higher percentage terms, a greater likelihood of cash guarantees and a greater number of extended engagements. The results are uniform and entirely consistent with the purpose and effect testimony discussed in previous sections.

In response, General Cinema offers no evidence contradicting these results, offering instead a few reasons why the theaters selected by Buena Vista are not perfectly comparable. General Cinema readily concedes that terms are much firmer and less susceptible to subsequent adjustment in bidding rather than splitting situations, but attempts to generate two factual questions about the effect of splits on price by arguing: 1) that any damage to Buena Vista was caused by its own corporate policy of voluntarily renegotiating terms on all negotiated licenses, including splits; and 2) that splits provide economic benefits to Buena Vista (*i.e.*, better outlets and play dates) that offset any loss of revenue resulting from the lessening of competition. These assertions by General Cinema are not material to the real issue involved, the existence of an anticompetitive effect. They have no bearing on competition, but rather appear to be part of a veiled effort to argue lack of standing because of an inadequate showing of damages and causation. As such, General Cinema's two "standing" theories regarding effect should be rejected as a matter of law. *See, e.g., Zenith Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n.9, 89 S.Ct. 1562, 1571 n.9, 23 L.Ed.2d 129 (1969).

In any event, these contentions, even if true, would not establish the complete absence of any effect on price, let alone the absence of an interference with price competition. The second theory (of compensating advantages) makes no denial of an effect on the *terms* of licenses in split situations, but merely contends that there is no overall damage to Buena Vista because any effect on the terms would be compensated for by factors (including the grossing potential of theaters) that are not altered by the existence of greater or lesser amounts of competition. General Cinema in its other theory claims that the entire effect on terms is a "voluntary" one within Buena Vista's power to avoid. The court has seri-

ous doubts whether General Cinema's evidence generates a genuine factual issue regarding voluntariness. More importantly, General Cinema has not supported its essential premise for this argument—that but for renegotiations after a "run" is completed, the license terms in split and bidding situations would be *identical.* There is considerable evidence to the contrary, including evidence that when bids are received, guarantees are given far more frequently and that percentages of gross revenues offered sometimes exceed the minimum amounts suggested by Buena Vista when bids are received.

### 4. *Prior caselaw on the anticompetitive nature of splits.*

General Cinema and NATO also rely on *Broadcast Music* for two additional reasons for declining to apply the per se rule: 1) that courts have not had "considerable experience" with splits leading to the "universal view" that they are unreasonable restraints of trade, 441 U.S. at 9–10, 16, 19 n.33, 99 S.Ct. at 1557, 1560, 1562 n.33 and 1553 and 2) that the prior position of the Justice Department cautions against "too easily" finding no competitive virtues in split of product agreements, *id.* at 16, 99 S.Ct. at 1560. The court, however, believes that these factors—the prior precedents on splits and the position of the Justice Department—in fact serve to highlight the anticompetitive nature of splits and offer additional support for applying the per se rule.[9]

In *Broadcast Music,* the Court noted that it had never before examined a practice like blanket licenses, and that the one recent challenge to the practices on a price-fixing theory had been rejected by the Ninth Circuit in 1967. 441 U.S. at 9, 13–14, 99 S.Ct. at 1557, 1559. By contrast, *National Socie-*

ty bears heavily on the legality of splits, and court challenges to splits have been far more numerous. Most have been brought by disgruntled exhibitors against both exhibitors and distributors for conspiring to deprive them of their "fair share" of quality first-run films. Many of the holdings of these cases are simply irrelevant to the legality of splits when challenged by distributors because the legal theory is completely different—a group boycott or refusal to deal as opposed to price-fixing (or possible market division). For example, in *Viking Theatre Corp. v. Paramount Film Distributing Corp.,* 320 F.2d 285 (3d Cir. 1963), *aff'd per curiam by an equally divided court,* 378 U.S. 123, 84 S.Ct. 1657, 12 L.Ed.2d 743 (1964), plaintiff exhibitor challenged the split system on the theory that failure to include all local exhibitors in the split constituted a per se violation of the antitrust laws. The Third Circuit was careful to point out that the legality of splits in general was not at issue, and made the narrow ruling, which has no relevance to this case, that the failure to include all exhibitors in a split does not render it illegal in the absence of evidence that it was so employed as to unreasonably restrict the competitive market. 320 F.2d at 292–93. Many of the exhibitor challenges to splits have been dismissed because of lack of injury to excluded exhibitors (since they face diminished competition for films), *see, e.g., Dahl, Inc. v. Roy Cooper Co.,* 448 F.2d 17 (9th Cir. 1971), or because courts have rarely found sufficient evidence of distributor participation in the splits, *see Wilder Enterprises, Inc. v. Allied Artists Pictures Corp.,* 632 F.2d 1135, 1141 (4th Cir. 1980).

Nevertheless, it is significant to note that many of the decisions in the exhibitor challenges to splits have commented on the

---

**9.** At least two commentators who have addressed themselves to splits have found them to be anticompetitive in nature. *See* Bork, *The Rule of Reason and the Per Se Concept: Price Fixing and Market Division,* 74 Yale L.J. 775, 826 & n.162 (1965) ("the apparent desire by the government to soften competition in order to protect exhibitors" with respect to splits is "in sharp contrast to the usual insistence of the

courts and the government on the per se illegality of horizontal market division"); Gordon, *Horizontal and Vertical Restraints of Trade: The Legality of Motion Picture Splits under the Antitrust Laws,* 75 Yale L.J. 239, 250 (1966) ("It is . . . beyond cavil that splitting interferes with the pricing mechanism by substituting private agreements not to compete for competitive price making.").

anticompetitive nature of splits with respect to price competition, even though that problem was not squarely raised because no distributor challenge was involved. In *Dahl, Inc. v. Roy Cooper Co., supra,* the Ninth Circuit observed that splits were "anticompetitive in character" and "as such subject to complaint by the distributors." 448 F.2d at 20. The Second Circuit in *Royster Drive-In Theatres, Inc. v. American Broadcasting-Paramount Theatres, Inc.,* 268 F.2d 246, 250 (2d Cir.), *cert. denied,* 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 121 (1959), while noting that it was not ruling on the legality of splits, stated unequivocally that splits enable exhibitors to purchase films at lower prices by dividing the list of available pictures and approaching distributors separately on that basis. In *Cinema-Tex Enterprises, Inc. v. Santikos Theaters, Inc., supra,* the district court found splits to be a per se violation of the antitrust laws from the distributors' standpoint, even though the judge went on to conclude that plaintiff, an exhibitor who was a willing participant in the splits, had failed to prove any damage. 414 F.Supp. at 643–44. The Fifth Circuit upheld the dismissal of the complaint, but reversed the finding of per se illegality on the sole ground that it was "beyond the necessities of the case." 535 F.2d at 933.

In *Admiral Theatre Corp. v. Douglas Theatre Co.,* 585 F.2d 877 (8th Cir. 1978), the Eighth Circuit refrained from deciding whether splits were per se illegal price-fixing under *National Society* because plaintiff-exhibitors again failed to make a sufficient showing of injury to get to the jury. However, the court did note the anticompetitive purpose and effect of splits. *Id.* at 890–91. Even in *United States v. Loew's Inc.,* [1962] Trade Cases (CCH) ¶ 70,347 (S.D.N.Y.), relied heavily upon by General Cinema to support the legality of splits where there is consent or participation by distributors, *see* Part IV, *infra,* the court stated that "any arrangement whereby exhibitors agree with each other that they will not compete in the buying of the product cannot be countenanced." *Id.* at 76,374.

There appears to be only one reported decision in which splits have been chal-lenged by a distributor. In *Twentieth Century Fox Film Corp. v. Goldwyn, supra,* the Ninth Circuit upheld the findings and conclusions of the district court that the challenged split agreement resulted in lower film rentals and decreased playing time and was illegal under the circumstances. 328 F.2d at 206. It is interesting to note that many of the same arguments raised by General Cinema were raised by defendant and rejected by the court in *Twentieth Century Fox* —for example, that splits are not anticompetitive because they were designed for the benefit of both distributors and exhibitors in order to assure a regular supply of product and outlets. The defendant also argued that splits did not occur unless the distributors involved were parties, and that the plaintiff distributor did not like competitive bidding and never initiated it on its own. *Id.* at 205–07.

General Cinema and NATO rely extensively on one other case clearly on point, *Greenbrier Cinemas, Inc. v. Attorney General,* 511 F.Supp. 1046 (W.D.Va.1981). *Greenbrier* was a declaratory judgment action brought by an exhibitor in order to challenge the Justice Department's contention in its April 1, 1977, press release that all splits are per se illegal. After a trial, the court reached the narrow holding that the split in Charlottesville, Virginia, must be evaluated under the rule of reason, and not the per se rule. However, this court declines to follow *Greenbrier* because it believes that the analysis in that case is flawed in several critical respects.

First, the parties in *Greenbrier* stipulated that no evidence regarding the purpose or effect of splits would be offered. *Id.* at 1059. The emptiness of the *Greenbrier* holding as a result of this stipulation is apparent from the court's statement that:

> Trial was thus limited to the issue of what the split agreement was, how it operated, and whether the agreement did constitute a *per se* violation of the Act *regardless of any effect it might or might not have had on competition or price.*

*Id.* at 1048 (emphasis added). *See also id.* at 1060 (discussion of evidence regarding purpose, although none was submitted). Even though the fact that splits suppress competition seems quite obvious, it would indeed be difficult for a court to characterize a practice as per se illegal for the first time without considering its "effect . . . on competition."

Second, the *Greenbrier* court found *Broadcast Music* to be "closely on point," *id.* at 1052, but paid no attention to the "practical or conspiratorial impediment" language which distinguishes that case. The lack of focus on the asserted existence of impediments to price competition and the use of ambiguous language deprives of much meaning the *Greenbrier* court's findings as to the operation of the Charlottesville split. *See id.* at 1054–55.

Third, the *Greenbrier* court does not even mention the price-fixing theory of the Justice Department which it apparently rejected. Nor does it bother to cite, let alone attempt to distinguish, the leading Supreme Court precedents supporting that theory— *National Society, Catalano,* and *Socony-Vacuum.*

Fourth and finally, the court declines to follow the *Greenbrier* decision because it found the rule of reason to be applicable without suggesting a single procompetitive benefit that results from splits. The court did not even note that such procompetitive justifications ought to be available before a court declines to apply the per se rule to a practice that reduces price competition.

### 5. *Position of the Justice Department.*

By contrast with *Broadcast Music*, in which the Justice Department urged as amicus curiae that blanket licenses were lawful, the Justice Department since April 1, 1977 has taken the position that splits are uniformly illegal per se. In a July 15, 1981, letter to Judge Robert Warren of the Eastern District of Wisconsin, where the Department has a civil action pending against several exhibitors for split agreements, *United States v. Capitol Service, Inc.,* 89 F.R.D. 578, Assistant Attorney General Wil-

liam Baxter states that the present Administration is "in complete agreement" with the position of the prior Administration that splits are "severely anticompetitive, confer no economic efficiencies, and are per se unlawful." Even prior to 1977, the Justice Department gave no general approval to splits. The record indicates, and General Cinema concedes, that the Department has always opposed splits in the absence of the full consent or participation of distributors. Buena Vista Appendix (April 27, 1981), at 219–30.

### III. ASSERTED PROCOMPETITIVE BENEFITS

General Cinema sets forth six justifications for splits which it contends are "procompetitive" benefits that require splits to be evaluated under the rule of reason. It asserts that splits offer to distributors as well as exhibitors the following advantages over competitive methods of licensing:

1) Greater lead time for advertising and other methods of exploiting the pictures;

2) Greater flexibility in scheduling runs;

3) Less paperwork, time and effort;

4) Less risk that an exhibitor will be without a picture and a distributor will be without a theater in which to play it;

5) Assurance to distributors of the outlets and play times of their choice; and

6) Protection of smaller, independent exhibitors.

Buena Vista argues that the court need not look beyond the evidence and the law establishing the anticompetitive character of splits. Buena Vista notes that the Supreme Court in *National Society* cited with approval the conclusion reached by the D.C. Circuit that the challenged agreement was "unlawful on its face" and therefore "illegal without regard to claimed or possible benefits." 435 U.S. at 686, 98 S.Ct. at 1362. It also argues that its strong showing of anticompetitive purpose and effect is sufficient to bring split agreements within the well-established price-fixing "category." Such price-fixing agreements have long

been held to be so "plainly anticompetitive" and so often lacking in "any redeeming virtue" that they are "conclusively presumed illegal without further examination under the rule of reason generally applied in Sherman Act cases." *Broadcast Music, Inc. v. CBS, Inc., supra,* 441 U.S. at 8, 99 S.Ct. at 1556; *NSPE, supra,* 435 U.S. at 692, 98 S.Ct. at 1365.

Based on the record establishing the manifestly anticompetitive nature of splits, particularly the testimony regarding purpose and effect and the close similarity of the *National Society* case, it is difficult to imagine procompetitive benefits of sufficient importance to outweigh the anticompetitive aspects of splits as is required to uphold the practice under the rule of reason. *See id.* at 691, 98 S.Ct. at 1365. On the other hand, the law is not entirely clear as to precisely how far a court must go in its examination of a practice before it may properly characterize it as falling within a category of the per se rule. There is some authority for evaluating both the asserted pro- and anticompetitive aspects of a challenged practice in determining whether it should be characterized as price-fixing. *See, e.g., State of Arizona v. Maricopa County Medical Society,* 643 F.2d 553, 556, 558 (9th Cir. 1980). Because of the breadth of Buena Vista's requested ruling and the court's desire to be convinced that splits have no "redeeming competitive virtues," *Broadcast Music, supra,* 441 U.S. at 13, 99 S.Ct. at 1559, before applying the per se rule, the court will address itself to General Cinema's six asserted procompetitive justifications for analysis under the rule of reason in this Part of the opinion.[10]

Before discussing each of the six arguments individually, the court will set forth two broad points applicable to all the claimed benefits which bear heavily on whether they are indeed proper procompeti-

tive justifications meriting consideration under the rule of reason: 1) the limitation of asserted benefits under the rule of reason to those which truly promote competition, rather than merely promote the convenience or financial gain of members of the industry affected; and 2) the horizontal character of splits.

### A. *Limitations on the Benefits that may be Asserted.*

The Supreme Court in recent decisions has greatly clarified the permissible scope of "procompetitive" justifications that may be considered under the rule of reason. Contrary to its name, the rule does not open the field of antitrust inquiry to "any argument in favor of a challenged restraint that may fall within the realm of reason." *NSPE, supra,* 435 U.S. at 688, 98 S.Ct. at 1363. Instead, the rule focuses exclusively on the challenged restraint's impact on competitive conditions. *Id.* The rule of reason is not designed to protect the convenience or financial benefits of the conspirators or even other entities involved in the industry. As the Court stated in *National Society,* the purpose of all antitrust analysis is "to form a judgment about the competitive significance of the restraint; it is not to decide whether a policy favoring competition is in the public interest, or in the interest of the members of an industry." *Id.* at 692, 98 S.Ct. at 1365.

General Cinema's contrary assertion that the rule of reason encompasses all "economic" factors is without basis in the caselaw. Although the Court in *Broadcast Music* does at one point refer to blanket licenses as "economically beneficial," 441 U.S. at 16, 99 S.Ct. at 1560, the opinion as a whole makes it quite clear that the efficiencies provided by the challenged practice in that case were of competitive significance because they were essential to the very existence of the

---

**10.** After carefully examining the arguments of counsel and the record, the court agrees with Buena Vista's alternative position that, as in *National Society,* no factual inquiry at trial should be conducted regarding these asserted benefits because none can properly be considered under the rule of reason. *See* 435 U.S.

at 686, 693–94, 98 S.Ct. at 1362, 1366. Any factual issues raised by the six justifications are therefore not material to the legality of splits, and the court need not consider further the factual basis for these justifications before rejecting them and declaring splits to be per se illegal. *See id.* at 681, 98 S.Ct. at 1360.

market for copyrighted compositions. *See id.* at 19–20, 99 S.Ct. at 1562. Thus, the Court held out the possibility that on balance the blanket licensing system served to perfect and enhance the operation of the free market for licensing musical compositions, as did the regulation of the hours of market trading in *Chicago Board of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), rather than to detract from the market's operation. The per se rule was deemed inappropriate because the practice might be one designed to "increase economic efficiency *and* render markets more, rather than less, competitive." *BMI, supra*, 441 U.S. at 20, 99 S.Ct. at 1562 (emphasis added).[11]

The Court has also unequivocally stated that, in the absence of an exemption from Congress for a specific industry, a restraint on competition cannot be justified on the theory that a less competitive system functions better than the competitive system which Congress mandated in enacting the Sherman Act. The Court could not have been clearer in stating that:

> The early cases also foreclose the argument that because of the special characteristics of a particular industry, monopolistic arrangements will better promote trade and commerce than competition.... [citations omitted]. That kind of argument is properly addressed to Congress and may justify an exemption from the statute for specific industries, but it is not permitted by the Rule of Reason. As the Court observed in *Standard Oil Co. v. United States*, 221 U.S., at 65 [31 U.S. at 517], "restraints of trade within the purview of the statute ... [can]not be taken out of that category by indulging in the general reasoning as to the expediency of having made the contracts or the wisdom or want of wisdom of the statute which prohibited their being made."

*NSPE, supra*, 435 U.S. at 689–90, 98 S.Ct. at 1364. *Accord, United States v. Socony-Vac-*

uum *Oil Co., supra*, 310 U.S. at 221–22, 60 S.Ct. at 843.

■ The court fully agrees with Buena Vista that all six asserted justifications for splits do not upon close scrutiny involve the promotion of competition in the licensing of films. All simply identify possible imperfections or inequities of the competitive method of allocating products, particularly competitive bidding, which General Cinema repeatedly asserts is "not always the most desirable or efficient means of licensing." The greater the amount of competition that manages to exist in spite of the split—*i.e.*, from excluded or withdrawn exhibitors, or after rejections of split designees and prior to any "reallocations"—the less extensive are the six advantages of splits offered by General Cinema. All six rationales thus are directly related to the suppression of competition, which helps to explain why in its early briefings on the subject of "procompetitive" benefits General Cinema relied primarily on rather conclusory assertions of the benefits of "orderly distribution," a concept that is an anathema to competition. Split members and even distributors may indeed receive some economic benefits from splits that may properly be urged as an offset to damages, but trial of these issues need not take place before the court concludes that splits are per se illegal. In a passage that is particularly apt here, Professor Sullivan states:

> A shorthand method which may help to identify a restraint affecting price as naked is to examine the arguments which are being pressed in justification of the practice. Certain asserted justifications are hallmarks of the naked restraint. If the arrangement is naked, any benefits to the public which can logically be asserted to derive from it will, when closely examined, come down to a contention that, for some reason or other, concerted decision making rather than competition is in this instance socially preferable.... Accept-

11. According to the oft-quoted language from *Chicago Board of Trade v. United States, supra*, at 238, 38 S.Ct. at 243. "The true test of legality [under the rule of reason] is whether

the restraint is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition."

ance of such an argument is flatly foreclosed by the policy of the statute; where the statute applies, Congress has chosen competition and not concerted action as the mode by which trade is to be regulated. Any contention that this judgment should be laid aside in particular instances must be addressed to Congress and not to the courts. This type of justification contrasts markedly with a contention, like that in *Chicago Board of Trade*, that competition is itself improved by the arrangement because it helps to make a more perfect market.

L. Sullivan, *supra*, § 74, at 202. The court believes that, as were the Society's asserted defenses in *National Society*, the claimed benefits from splits are beneficently worded but nevertheless " a frontal assault on the basic policy of the Sherman Act." *Id.* at 695, 98 S.Ct. at 1367. General Cinema's assertion of the six claimed benefits thus "confirms rather than refutes the anticompetitive purpose and effect of its agreement." 435 U.S. at 693, 98 S.Ct. at 1362.

B. *Horizontal Nature of Splits.*

A second broad reason why splits do not offer genuine procompetitive benefits as a matter of law is that splits are, first and foremost, agreements among competitors. Courts have long viewed such agreements among competitors, referred to as "horizontal" restraints, as "naked restraints of trade with no purpose except stifling of competition." *See, e.g., White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963). By contrast, characterization of at least certain types of restraints, including territorial limitations on retail or distributor outlets, as "vertical" has provided a basis for a finding of procompetitive benefits to be weighed under the rule of reason. *Id.* at 261, 263, 83 S.Ct. at 700, 702, *Continental*

*T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) (hereinafter *Sylvania* ).

General Cinema contends that splits are "vertical" arrangements simply because entities at a level of the market structure different from the exhibitors—namely, the distributors—"participate" in splits. Even if such participation could be proven, however, the court for several reasons rejects General Cinema's effort to characterize all or even any splits involved in this suit as "vertical" in the hope of establishing a genuine factual issue regarding the existence of procompetitive benefits.

First, leaving aside the obvious horizontal aspects of splits, the law is clear that splits must be *imposed* by the distributors in furtherance of their own interests in order to truly have any vertical characteristics. *See, e.g., Donald B. Rice Tire Co. v. Michelin Tire Corp.*, 638 F.2d 15, 16 (4th Cir. 1981); *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1242 (3d Cir. 1975); *L. Sullivan, supra*, § 130, at 376. The imposition requirement appears to be an application of the general principle in antitrust law that many unilateral acts (*i.e.*, restrictions imposed by a single manufacturer on its distributors) are completely lawful but become violative of antitrust law when performed pursuant to an agreement among competitors. *See, e.g., United States v. Parke, Davis & Co.*, 362 U.S. 29, 47, 80 S.Ct. 503, 513, 4 L.Ed.2d 505 (1962); *Plymouth Dealers' Ass'n v. United States*, 279 F.2d 128, 134 (9th Cir. 1960). A number of General Cinema's asserted procompetitive benefits purportedly serve the interests of distributors, but General Cinema's proffered evidence that distributors have consented to or even participated in splits falls far short of supporting even an inference that any distributor *since 1974* has *imposed* any of the splits on any exhibitor(s).[12] *See, e.g.,*

12. In this regard it is interesting to note that the memorandum of the eight distributors who have participated as amici curiae in strong language denied General Cinema's contention that distributors participate and consent to splits because they benefit from them:

... the Distributors are adamantly opposed to, and have not, do not and will not participate or acquiesce in any exhibitor split arrangement. The Distributors regard any and all exhibitor splits as horizontal, anticompetitive agreements among competitors aimed at the Distributors, which are competitively in-

Transcript of September 28, 1981, proceedings at 61–64. The court agrees with Buena Vista that the record lacks any probative evidence of explicit distributor encouragement of splits, let alone of imposition of splits by Buena Vista.

Second, even if General Cinema could establish that splits have some "vertical" character to them, the record indicates that splits should be classified as horizontal agreements on the authority of *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). In that case the Court held illegal per se an agreement among dealers in which the manufacturer actively participated. In *Sylvania, supra,* the Court cited *United States v. General Motors* for the proposition that "[t]here is no doubt" that restrictions "originating in agreements among the retailers" would be "horizontal" and therefore illegal per se. 433 U.S. at 58 n.28, 97 S.Ct. at 2561 n.28. Although the Court recognized that differentiating such agreements from truly "vertical" restraints might occasionally be difficult, the court finds that no such difficulty here. General Cinema's evidence of distributor consent or participation can hardly be said to negate the extensive testimony that splits originated with agreements among exhibitors, even if distributors were involved at the outset, of which there is no evidence. *See also United States v. Koppers Co., Inc.,* 652 F.2d 290, 297 (2d Cir. 1981).

■ Finally, even if General Cinema could somehow characterize any split as "vertical," the court believes that a finding of per se illegality and an absence of valid procompetitive justifications would be warranted because splits involve restraints on price competition. Although the Court in *Sylvania* held that vertical territorial restraints imposed by the manufacturer must be analyzed under the rule of reason, the Court specifically noted that its ruling dealt only with "nonprice" vertical restrictions.

433 U.S. at 51 n.18, 97 S.Ct. at 2558 n.18. The Court added that the per se illegality of price restrictions has been "established firmly for many years," *see, e.g., Dr. Miles Medical Co. v. Park & Sons,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911), and "involves significantly different questions of analysis and policy" that "could easily justify different treatment" for price and nonprice restrictions. 433 U.S. at 51 n.18, 97 S.Ct. at 2558 n.18. Indeed, in *United States v. General Motors Corp., supra,* the Court suggested that the horizontal/vertical distinction was not of great importance in light of the "special solicitude" under the antitrust laws given to "the protection of price competition from conspiratorial restraint." 384 U.S. at 148. *Accord, National Constructors Ass'n v. National Electrical Contractors Ass'n, Inc.,* 498 F.Supp. 510, 535 (D.Md. 1980). General Cinema asserts that *Sylvania* holds that only one form of vertical price restraint, "resale price maintenance," is exempt from the rule of reason. But the Court in *Sylvania* referred broadly to "price restrictions," 433 U.S. at 51 n.18, 97 S.Ct. at 2558 n.18, and this court is aware of no reason why restraints involving the price of goods when resold to the public should be treated differently from restraints on price in the purchase of those goods by competing retailers (in this case, the exhibitors).

C. *Individual Analysis of Asserted Procompetitive Benefits*

1. *Greater lead time.*

This asserted benefit perhaps comes the closest of the six to being material to the legality of splits. If splits could be characterized as vertical restrictions imposed by distributors, General Cinema could conceivably argue (as it has not explicitly done) that, along the lines of *Continental T.V., Inc. v. GTE Sylvania Inc., supra,* splits promote competition in a second sphere—the competition among distributors and exhibitors for audiences—by providing greater

distinguishable from price fixing, bid rigging, and customer allocation schemes. The injury suffered by the Distributors as a consequence of splits is direct and substantial.

Memorandum of Avco Embassy, et al. in Support of Conditional Motion to Participate as Amici Curiae, at 3–4.

lead time and therefore the opportunity for better advertising and other methods of exploitation than is permitted by competition in the licensing of films. However, as noted above, the analogy to *Sylvania* fails because the record provides no support for a characterization of splits as vertical. In addition, there are two other reasons why the lead time contention presents no triable issues of fact in this case.

First, the court has serious doubts that General Cinema has created a genuine issue of fact as to whether splits provide more lead time than nonsplit methods of distribution, including the negotiations with competing exhibitors that could take place in the absence of a split. Even though a competitive process may take longer to complete, the testimony in the record is uniform that bids are normally solicited many months (five or six, for example) in advance of release and split meetings are generally held only a month or two in advance. Neither in argument nor in evidence has General Cinema offered a coherent explanation as to why splits necessarily lead to significantly greater lead time than competitive alternatives.

Second, to the extent that General Cinema has offered an explanation of its lead time argument, it appears to be based on the elimination of the "chaotic" competitive conditions that sometimes result when exhibitors are uncertain as to which films will be awarded to them. Splits offer the prospect of a cozier and simpler process, but only to the extent that they are not subject to the injection of competition. For example, if exhibitors who are not members of the split choose to bid against the split designee, the lead time advantage disappears. Since the asserted benefit of lead time/greater exploitation is directly premised on the suppression of competition, it cannot be countenanced under the rule of reason unless perhaps it is more than a mere convenience. *See NSPE, supra,* 435 U.S. at 689–90, 98 S.Ct. at 1364. In response to the court's repeated questions on this point, General Cinema has offered no evidence suggesting that a reduction in competition is in some way "essential" to

the proper exploitation of films in the marketplace. *See BMI, supra,* 441 U.S. at 19–20, 99 S.Ct. at 1562. To the contrary, General Cinema and Buena Vista agree that at least one-half to two-thirds of all motion picture licenses prior to April, 1977, were not entered into under a split arrangement. Presumably, splits have been even less frequent since that time. Yet there is no evidence nor argument from General Cinema that insufficient or inadequate exploitation of films by distributors or exhibitors occurs in the absence of splits.

Nor would one expect that splits would be essential to the proper exploitation of films from an analysis of economic incentives. In *Sylvania,* the manufacturer may have needed to impose territorial restrictions on its franchised retailers in order to induce them to promote its products properly through advertising, quality service, etc., because of the so-called "free rider" problem of competitors refraining from doing what is in their collective interests on the expectation that others will do it for them. 433 U.S. at 55, 97 S.Ct. at 2560. Here, by contrast, there is no similar "free rider" problem or other compelling justification for reducing competition because both distributors and exhibitors have ample incentive to speed the licensing process along in a competitive environment so that proper exploitation of films can occur.

### 2. *Flexibility in scheduling runs.*

General Cinema argues that the absence of competition in splits leads to less firm commitments of playing times, as distributors are far more receptive to letting exhibitors out of commitments to long runs in split situations. It asserts that this "flexibility" benefits distributors in two rather indirect ways: 1) by giving the distributor whose picture is pulled an opportunity to make greater revenues *if* it has a replacement picture that will perform better; and 2) by opening up more theaters which in turn helps other distributors. General Cinema also claims a benefit to the general public in that screens are not tied up with pictures the public does not want to see

simply because the exhibitor made a firm commitment in the bidding process.

The court, however, fails to see how this so-called "flexibility" benefit can be characterized as promoting competition. The record is clear that firm commitments to length of playing time are every bit as much an element of the terms of a license as are percentages of box office receipts and cash guarantees. *See also Twentieth Century Fox Film Corp. v. Goldwyn, supra,* 328 F.2d at 206. The Sherman Act hardly permits an argument that an effect on an element of price resulting from an agreement to reduce competition is "procompetitive." *See, e.g., Catalano v. Target Sales, Inc., supra.* General Cinema expresses concern about the "inefficiency" of empty theaters for periods of weeks that may sometimes result from the competitive process. But our economic system posits that the market should decide what is in the best interests of consumers. As the Court said in *National Society,* it has never accepted the argument that a restraint on price competition "ultimately inures to the public benefit." 435 U.S. at 693–94, 98 S.Ct. at 1366.

Even if the flexibility argument were a permissible procompetitive defense, it is an impermissibly overbroad justification for a restriction on competition. *See id.* at 696, 98 S.Ct. at 1367; *id.* at 699–700, 98 S.Ct. at 1369 (Blackmun, J., concurring). General Cinema has offered no inherent reason why non-split situations cannot or do not have adequate "flexibility." The record indicates that in spite of firm commitments, exhibitors may pull a picture early by paying a penalty. General Cinema suggests that distributors are locked into the firm commitments of playing time in bidding situations for fear of claims of unfair treatment by exhibitors who were not awarded the picture. But the court sees no genuine barrier to the distributor relieving exhibitors of their commitments in most circumstances *if* it is truly in the interests of the distributor to do so.

### 3. *Less paperwork, time and effort.*

General Cinema points out that splits are a less elaborate and time-consuming method of licensing films than is competitive bidding. But there is no evidence in the record supporting a claim that savings in paperwork and effort are substantial. Thus, General Cinema's transaction cost argument is clearly distinguishable from that in *Broadcast Music,* where the Court found that blanket licensing led to a "substantial" lowering of costs for both sellers and buyers as part of its performance of "essential" regulatory and integrative functions. 441 U.S. at 20–23, 99 S.Ct. at 1562–64. In any case, paperwork, time and effort may be substantially reduced by bid-rigging conspiracies and cartels which replace individual with concerted decision-making. Surely the antitrust laws do not permit competition to be suppressed on the basis of the inconvenience and expense of competition.

### 4. *Less risk.*

General Cinema next complains that under competitive methods of licensing, exhibitors face the risk of having all their bids for a given period rejected, and distributors the risk that no one will license their pictures. Competitors in many industries face risks and uncertainties, and the Sherman Act forecloses an argument to the courts that the film industry deserves relief from the burdens of competition. *NSPE, supra,* 435 U.S. at 689–90, 98 S.Ct. at 1864.

### 5. *Assurance of desired theaters and play times.*

The next asserted benefit is that splits "assure" distributors of the outlets and play times of their choice. General Cinema claims that this benefit is of special value to Buena Vista because of its particularized needs of large theaters in locations suitable to young audiences at certain times of the year. Apparently, the theory behind this asserted benefit is that lack of competition facilitates the efforts of distributors to license the theaters that they want because it is easier to make deals in a split situation.

Presumably, the claimed *assurance* of satisfying the distributor's preference occurs to the extent that split members reallocate rights of first negotiation when the initial selection by the exhibitors, the split designee, does not prove to be satisfactory to the distributor.

[redacted] The allegedly sincere efforts of split participants, including General Cinema, to allocate and reallocate films among themselves according to the wishes of distributors in no way promote the interests of competition. The "good intentions" of the members of the combination are no legal justification for a lessening of price competition, *United States v. Socony-Vacuum Oil Co., supra,* 310 U.S. at 221–22, 60 S.Ct. at 843, nor is the improvement of the well-being of individual traders affected by the restraint. *NSPE, supra,* 435 U.S. at 692, 695, 98 S.Ct. at 1365, 1367.

6. *Protection of smaller, independent exhibitors.*

Finally, General Cinema expresses concern that some of the smaller, independent exhibitors would go out of business under a more purely competitive set of licensing procedures, and therefore it argues that splits promote competition in the long run by keeping more potential competitors in business. General Cinema's reasoning is simply that competition means higher prices for films, including more frequent firm guarantees, and that some exhibitors will not be able to afford these higher prices for first quality pictures. The testimony in support of this expressly anticompetitive rationale constitutes yet another set of admissions of purpose to and effect of suppressing competition and thereby lowering price. *See, e.g.,* Lapidus Declaration ¶ 21. In addition, General Cinema's claim that splits are needed to assure that all exhibitors get their "fair share" of quality films is somewhat ironic in view of the volume of exhibitor challenges to splits on the grounds that they unlawfully exclude smaller, independent exhibitors. *See, e.g., Greenbrier Cinemas, Inc. v. Attorney General, supra,* 511 F.Supp. at 1048 n.4.

General Cinema relies upon *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 161–64, 68 S.Ct. 915, 931–32, 92 L.Ed. 1260 (1948), as support for the procompetitive nature of its protection claim. In that case, the Supreme Court struck from the decree entered by the district court the requirement that all films be licensed by competitive bidding, in part because of the "natural advantage which the larger and financially stronger exhibitors would seem to have in the bidding." General Cinema also indicates that the reason why the Justice Department, in enforcing the *Paramount* decree, was reluctant to condemn splits involving the full participation of distributors and exhibitors was the *Paramount* Court's concern about the fate of the smaller independents. This court, however, does not agree that *Paramount* is proper authority for justifying a suppression of competition. The Court's concerns about competitive bidding arose in a remedial context in which the Court approved the breakup of five firms which had integrated the production, distribution and exhibition functions in the film industry. The Court did not approve of splits or any other restraint on competition; nor did it disapprove of competitive bidding or any other competitive form of licensing. The Court merely expressed its concerns that it should not uniformly impose competitive bidding on the industry because such an order would "involv[e] the judiciary so deeply in the daily operation of this nationwide business" without significantly benefitting the independent exhibitors who had been harmed by the practices of the integrated major companies. *Id.* Thus, the Court observed, "the *court-created system* [of competitive bidding] may be a powerful factor towards increasing the concentration of economic power in the industry *rather than cleansing the competitive system of unwholesome practices.*" *Id.* at 164, 68 S.Ct. at 932 (emphasis added).

[redacted] Here, the concern about small independents is raised 33 years after the *Paramount* decree, and not in a remedial context. The advantages or disadvantages of requiring competitive bidding are not prop-

erly in question in this case, because Buena Vista does not seek an order imposing competitive bidding on all licensing transactions. *See NSPE, supra*, 435 U.S. at 694–95, 98 S.Ct. at 1366–67. It seeks only a prohibition of split agreements, and an opportunity to license its pictures in a competitive environment. The policy of the Sherman Act forbids this court from inquiring whether such an environment is good or bad. *Id.* at 695, 98 S.Ct. at 1367.

General Cinema attempts to characterize its protection of small, independent exhibitors argument as a "temporary and limited" sacrifice of competition which is needed to encourage more firms to enter or remain in the exhibition business in the long run. But cases which have permitted such a "temporary and limited" loss of competition have involved covenants that are ancillary to a legitimate transaction such as the sale of a business, *see Mitchel v. Reynolds*, 1 P.Wms. 181, 24 Eng.Rep. 347 (1711), *cited in NSPE, supra*, 435 U.S. at 688–89, 98 S.Ct. at 1363–64. In the present context, General Cinema's argument reduces to another form of the age-old cry of "ruinous competition" which is at war with the principles of the Sherman Act. *See id.* at 690–91 n.16, 98 S.Ct. at 1364–65; *United States v. Topco Associates, Inc.*, 405 U.S. 596, 610–11, 92 S.Ct. 1126, 1134–35, 31 L.Ed.2d 515 (1972); *United States v. Socony-Vacuum Oil Co., supra*, 310 U.S. at 221–22, 60 S.Ct. at 843.

Indeed, in *Catalano, Inc. v. Target Sales, Inc., supra*, the Court rejected an asserted procompetitive justification similar to the one set forth here by General Cinema. The Ninth Circuit had suggested, as one reason why the rule of reason should apply to a horizontal agreement to eliminate credit sales, that the benefits from such an agreement might promote competition by encouraging firms to enter the market. General Cinema argues that an agreement among competitors to restrict price competition can be justified because it helps to keep certain existing traders in business. As the *Catalano* Court noted, these contentions about promoting entry or preserving competitors could be used to justify *all* horizontal agreements or monopolistic practices. Both ver-

sions of the argument in the end lead to the same conclusion, that "the more successful an agreement is in raising [in this case, lowering] the price level, the safer it is from antitrust attack." 446 U.S. at 649, 100 S.Ct. at 1928. "Nothing," the Court concluded, "could be more inconsistent with our cases." *Id.*

## IV. DISTRIBUTOR PARTICIPATION AND CONSENT

General Cinema predicates much of its argument for the rule of reason standard on its contention that distributors, and Buena Vista in particular, have "acquiesced," "consented" and "participated" in splits. These terms are not well-defined, but the parties have agreed that "acquiescence" is an involuntary form of acceptance, as distinguished from "consent," which has an element of voluntariness. *See Twentieth Century Fox Film Corp. v. Goldwyn, supra*, 328 F.2d at 205. "Participation" suggests a more active involvement than mere "consent." There are genuine factual issues in the record regarding Buena Vista's acquiescence and perhaps even consent to various individual splits across the country, since the record bears at least the inference that Buena Vista knew that splitting was occurring in many areas. As will be discussed below in Section D, the evidence of Buena Vista's participation in splits, aside from perhaps a few isolated instances, is very weak. Nevertheless, given the rigorous standards for summary judgment, General Cinema may have set forth sufficient evidence to have created a genuine factual dispute regarding "participation" by distributors.

■ However, the court agrees with Buena Vista that as a matter of law, evidence of its acquiescence, consent or participation in splits is not material to the question of General Cinema's liability under Section 1 of the Sherman Act. General Cinema asserts four legal theories for making such evidence material to liability: 1) If Buena Vista has participated in or consented to splits, it has no standing to sue be-

cause it cannot have been damaged; 2) Participation or consent by distributors converts splits into vertical arrangements; 3) Buena Vista's participation in splits amounted to "complete involvement"; and 4) Prior precedents regarding splits have considered similar evidence.

The court believes that none of these provides a persuasive rationale for making consent or participation, let alone involuntary acquiescence, a basis for judging splits under the rule of reason. The court's focus must be on the effect of splits on competitive conditions. General Cinema's evidence of consent and participation in no way suggests that splits enhance the vigor of competition, nor does it significantly lessen the restrictions split agreements impose on competition.

## A. Standing

General Cinema asserts that Buena Vista's participation or consent in splits makes "inconceivable" the possibility that it has been damaged by them. However, this conclusion is by no means inevitable from proof of consent or even participa-

tion of the kind that General Cinema has suggested in its arguments and evidence. In addition, proof of actual damage to Buena Vista is different from proof of harm to competition. In any case, Buena Vista clearly has standing to sue for injunctive relief. *See* II P. Areeda & D. Turner, *supra*, § 328; *Zenith Radio Corp. v. Hazeltine Research, Inc., supra*, 395 U.S. at 130, 89 S.Ct. at 1580; *In re Multidistrict Vehicle Air Pollution*, 481 F.2d 122, 130 (9th Cir.), *cert. denied*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973).[13]

## B. Vertical Arrangements

General Cinema next argues that Buena Vista's participation and consent transform splits into vertical arrangements, which are far more likely to have procompetitive effects than horizontal combinations of competitors. The court in Part III(B) of the opinion has explained why this argument is not persuasive.

## C. The Complete Involvement Defense

The third theory that General Cinema offers for the relevance of participation and

---

**13.** To obtain standing to seek injunctive relief the plaintiff must "demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Corp. v. Hazeltine Research, Inc.*, 395 U.S. at 130, 89 S.Ct. at 1580. General Cinema's asserted termination of its participation in splits since the Justice Department's change of position in no way precludes a finding of threatened injury here. General Cinema has publicly noted its disagreement with the Justice Department's position and its intention to abide by that position only as long as required to do so:

In April of 1977 the Justice Department issued a statement that product splitting will be considered a *per se* violation of the antitrust laws.... This practice has been a tradition in the industry since the Paramount Consent Decree of 1946 and has been countenanced and in some instances encouraged by the Justice Department or the courts for a period of thirty years. We expect that the Justice Department's position will be challenged in the courts. In the meantime, however, the Justice Department's position has created uncertainty in the industry and conceivably will add somewhat to film costs. General Cinema Corp., Annual Report (1977), in Buena Vista Appendix (April 27, 1981), at 237.

Moreover, the fervor and vehemence with which General Cinema has alleged the competitive benefits of splits and defended its past conduct throughout this action indicate to the court that any cessation of participation in the splitting process is only temporary. General Cinema and other exhibitors cannot reasonably be expected to give up voluntarily a practice which has been an industry "tradition" for years and which they consider to be highly advantageous. Nor can the Justice Department's position, subject as it is to political fluctuations and changing administrations, provide an adequate check against future split agreements.

The court is therefore convinced that Buena Vista has demonstrated a real possibility of continued violations of the antitrust laws. Because of Buena Vista's unequivocal decision, as demonstrated by this segment of the lawsuit, not to participate in any future split agreements, General Cinema cannot argue, as it has with regard to past splits, that Buena Vista's alleged participation or consent offsets or precludes a finding of any damages. The clear anticompetitive purpose and effect of splits and the great likelihood that General Cinema will continue to participate in future splits thus creates a "significant threat of injury" to Buena Vista.

consent is based upon the Ninth Circuit's decision in *Javelin Corp. v. Uniroyal, Inc.*, 546 F.2d 276 (9th Cir. 1976), *cert. denied*, 431 U.S. 938, 97 S.Ct. 2651, 53 L.Ed.2d 256 (1977). In that case, plaintiff Javelin "voluntarily sought membership in the [defendant distributor] group and actively participated in and benefitted by" the restraints it challenged. 546 F.2d at 280. The Ninth Circuit noted that the Supreme Court in *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 140, 88 S.Ct. 1981, 1985, 20 L.Ed.2d 982 (1968), had held that the doctrine of *in pari delicto* ("of equal fault") "is not to be recognized as a defense to an antitrust action." 546 F.2d at 278. After analyzing the caselaw following the *Perma Life* case, the Ninth Circuit held that the "complete involvement and participation" defense left open by the Supreme Court could bar an antitrust plaintiff's recovery only when:

> the illegal conspiracy would not have been formed but for the plaintiff's participation. To satisfy this test, the jury must necessarily find that the degree of participation of the plaintiff must be equal to that of any defendant and a substantial factor in the formation of the conspiracy.

*Id.* at 279. The court, emphasizing the "high burden of proof" upon any defendant seeking to bar the plaintiff's suit based upon its joint participation, found that even the extensive participation by plaintiff Javelin in the conspiracy "falls well short" of barring his cause of action. *Id.* at 279–80.

■ This court declines to permit General Cinema to raise the "complete involvement" argument as a defense to liability under the circumstances of this case. Because plaintiff is suing "not only on its own behalf, but as a 'private attorney general' representing the public interest," an enforcement function that courts should encourage, *id.* at 280, the court believes that the *Javelin* defense cannot bar plaintiff's claims for injunctive and declaratory relief. General Cinema notes that the Ninth Circuit in *Thi-Hawaii, Inc. v. First Commerce Financial Corp.*, 627 F.2d 991, 996 (9th Cir.

1980), barred even injunctive and declaratory relief under the "unique and limited set of facts" of that case. Plaintiff in *Thi-Hawaii* sought by its antitrust claim to have one provision red-pencilled out of a lease, the effect of which would have produced a "windfall" for plaintiff because it would have retained all the benefits of the lease without the challenged restriction. The court emphasized that it could not "with good conscience" leave plaintiff in so favorable a position. Injunctive relief against future splits would give Buena Vista no similar windfall gain from its own wrongdoing.

General Cinema raises the complete involvement defense with respect to treble damages as well as liability, but the court declines to rule on the application of the defense to damages at this time. Buena Vista argues that General Cinema has thus far brought forward no facts that could even by inference establish Buena Vista's complete involvement in any split, let alone in all splits across the country. Although this argument appears persuasive, the pending motion is only one for partial summary judgment on the issue of liability. The court believes that it should defer to a later date all issues concerning damages, including General Cinema's alternative theory for claiming that recovery of damages should be entirely barred—that it justifiably relied on prior precedent.

### D. *Prior Precedent*

General Cinema also relies upon *United States v. Loew's, Inc.* [1962] Trade Cases (CCH) ¶ 70,347 (S.D.N.Y.). The court in *Loew's* stated that agreements not to compete in the licensing of films "cannot be countenanced," but that it is equally clear that splits of product with the consent of both distributors and exhibitors are proper." *Id.* at 76,374. This court, however, for several reasons finds the *Loew's* case to be entirely unpersuasive authority for making Buena Vista's consent or participation relevant to legality of the splits at issue in this case. *See* Gordon, *Horizontal and Vertical Restraints of Trade: The Legality of Mo-*

*tion Picture Splits under the Antitrust Laws*, 75 Yale L.J. 239, 241–51 (1966).

First, the court's observation in *Loew's* is merely dicta. The case involved a petition by an exhibitor under the *Paramount* decree to acquire a new facility. Competitors of the petitioner appeared as amici curiae to contest the proposed acquisition, claiming that petitioner's anticompetitive proclivities were demonstrated by a number of its actions, including its participation in splits. Obviously, the legality of splits was not a direct issue in the case. The *Loew's* court cited two cases and a law review article for its dictum regarding consent, but none is supportive. As this court noted in Part III(C)(6), the Supreme Court in *United States v. Paramount Pictures, Inc.*, *supra*, did not in any way rule on the legality of splits, nor did it comment upon the legal effect of the consent or participation of one or more distributors in such agreements to restrict competition. The Second Circuit in *Royster Drive-In Theatres v. American Broadcasting-Paramount Theaters, Inc.*, *supra*, 268 F.2d at 250, explicitly stated that it was not called upon to deal with the legality of splits in that case, and merely noted as a factual matter that splits "probably ten[d] to keep more exhibitors in business than would be the case if competitive bidding were the universal rule," citing the *Paramount* decision.

The record in this case suggests that the *Loew's* dictum may have reflected the Justice Department's enforcement policy at that time. Of course, the Supreme Court has repeatedly stated that the Government's attitude toward a practice cannot rewrite the Sherman Act or create legal immunities, "[o]therwise national policy on such grave and important issues as this would be determined not by Congress . . . but by virtual volunteers." *United States v. Socony-Vacuum Oil Co.*, *supra*, 310 U.S. at 227, 60 S.Ct. at 846.

The Ninth Circuit in *Twentieth Century Fox Film Corp. v. Goldwyn*, *supra*, gave the weakest possible support to the *Loew's* dictum in stating that "[f]or purposes of this case, we may assume that . . . [the *Loew's* excerpt] is a correct statement of the law." 328 F.2d at 205. The court did not need to rule on the correctness of *Loew's* because it went on to affirm the district court's finding of no advance consent by the distributor. *Id.*

Second, and even more importantly, the *Loew's* dictum lacks any persuasive force. The *Loew's* court offered no explanation as to how the consent or participation of distributors could possibly bear on the effect of splits on competition. Nor has General Cinema directly addressed this issue in response to the repeated questioning of the court. As suggested by the analysis of the asserted pro- and anticompetitive effects of splits in Parts II and III, the court concludes that General Cinema's proffered evidence of acquiescence, consent and participation, even if proven at trial, could have no effect on the challenged restraint's "impact on competitive conditions." *See NSPE*, *supra*, 435 U.S. at 688, 98 S.Ct. at 1363.

 Even the active consent and participation of *all* distributors in a split—a scenario which General Cinema has made no effort to show has ever existed anywhere in the country, since it has focused almost entirely on the consent and participation of Buena Vista alone—would not eliminate the agreement's purpose and effect of suppressing price competition. If *no* distributor ever sought competing offers from more than one exhibitor, and *no* exhibitor ever came forward to compete against another exhibitor, that split would nevertheless restrain competition, because firms in an industry cannot by unanimous agreement waive the rules of competition imposed by the Sherman Act. General Cinema asserts that splits could not have operated without distributors' "willingness to go along" and make adjustments in film rental. Even assuming that Buena Vista by itself could, without unlawfully combining with other distributors, "break up" a split by regularly rejecting the split designees that approach it and by vigorously seeking competitive offers, the failure of Buena Vista to do so (or, as General Cinema contends, even to

try), can hardly bar a judgment that splits are per se illegal restraints of trade. Buena Vista would under those circumstances be deprived of the competition from the split designees to which it is entitled. Furthermore, the Sherman Act does not impose on antitrust plaintiffs an obligation to endeavor to seek and destroy conspiracies before challenging them in court, nor does the coverage of the Act extend only to combinations that are invincible to attack by the resourceful firms affected. *See Simpson v. Union Oil Co.,* 377 U.S. 13, 16, 84 S.Ct. 1051, 1054, 12 L.Ed.2d 98 (1964).

General Cinema argues that Buena Vista in various ways has shown that it lacks enthusiasm for competitive bidding, or even for competition in general. For example, General Cinema points to evidence that Buena Vista on occasion rejected a bid by an exhibitor who was not participating in the split in favor of licensing the film to the split designee. General Cinema recites Buena Vista's efforts to "steer" pictures to those theaters, including ones owned by split designees, which Buena Vista in its business judgment thought had the greatest grossing potential. There is evidence that Buena Vista employees contacted General Cinema film buyers to indicate their interest in General Cinema theaters, and on one occasion a Buena Vista employee is said to have attended a split meeting.

None of these activities is strong evidence of Buena Vista's active consent or participation in splits, since General Cinema concedes, as it must, that it is proper for distributors to take into account grossing potential as well as the terms offered in making licensing decisions. In any case, whether Buena Vista did seek or should have sought to elicit competition from split members is irrelevant to the issues of liability in this suit. In *National Society, supra,* defendant argued that certain entities, including the federal government under the Brooks Act, 40 U.S.C. §§ 541–544 (1970 ed., Supp. V), considered it reasonable for members of the Society to eliminate competitive bidding in their purchases of engineering services. But the Court squarely rejected this argument, stating that "the reasonable-

ness of an individual purchaser's decision not to seek lower prices through competition does not authorize the venders to conspire to impose that decision on all other purchasers." 435 U.S. at 694–95 & n.21, 98 S.Ct. at 1366–67 & n.21.

Nor has General Cinema offered more than a conclusionary assertion that Buena Vista's alleged consent or participation shows that there must be procompetitive benefits to splits. The court will not speculate about the many possible reasons why distributors have at a minimum tolerated the existence of splits over the years since the *Paramount* decision. *See* Gordon, *supra,* 75 Yale L.J. at 241 & n.5. Perhaps one of the reasons is that splits have in some respects benefitted distributors, but it does not follow that such benefits are properly considered by this court because they promote competition. As discussed in Part III(B) of the opinion Buena Vista's alleged participation or consent to splits does not convert them from horizontal agreements to vertical restrictions that yield procompetitive benefits. Nor does the distributors' tolerance of or perhaps "acquiescence" in splits have any legal consequence of itself. Many practices later held to be unlawful per se have openly and widely occurred for many years. *See, e.g., Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975); *NSPE, supra,* 389 F.Supp. at 1205–07.

## V. SPLITS NEED NOT BE EVALUATED ON A CASE-BY-CASE BASIS

In urging the court to decide the question of the legality of splits on a case-by-case basis at trial, General Cinema and amicus curiae NATO rely on dicta from *Greenbrier Cinemas, Inc. v. Attorney General, supra.* The *Greenbrier* court, after holding that evaluation of one local split should be conducted under the rule of reason, went on to conclude without explanation or citation to authority that "[i]t follows that analysis of other splits can only be made on a case by case basis." 511 F.Supp. at 1060.

This court disagrees. It sees no basis for undertaking the burdensome task of examining separately each individual split to determine whether it is per se illegal or an unreasonable restraint of trade. Some splits may restrict competition to a greater extent than others. Under certain conditions in the film market, for example, certain splits may be structured with the purpose and with the effect of converting the "first rights of negotiation" into "exclusive" rights in the designated exhibitors. Others may permit competition if the distributor rejects the split designee because the split members, even after "reallocation," have failed to select an exhibitor suitable to the distributor.

But the record shows that all splits involve an agreement or understanding not to interfere with the split designee's initial opportunity to negotiate. According to the evidence and the caselaw, all splits therefore have a purpose and effect to suppress competition and reduce the terms of film licenses. No splits in this lawsuit, even those which assertedly involve the acquiescence, consent or participation of Buena Vista or any other distributors, provide any legitimate procompetitive benefits under the guidelines set forth by the Supreme Court in recent decisions. Splits do vary in the mechanics of how films are allocated and in the extent of the participation by exhibitors in a given area. But these distinctions have no bearing on the effect of splits on competition, and it is well-settled that "the machinery employed by a combination for price-fixing is immaterial." *See Catalano, Inc. v. Target Sales, Inc., supra*, 446 U.S. at 647, 100 S.Ct. at 1927; *United States v. Socony-Vacuum Oil Co., supra*, 310 U.S. at 223, 60 S.Ct. at 844.

The court thus concludes that all splits at issue in this case are per se violations of the Sherman Act. Whether and to what extent Buena Vista has been damaged by each split it can prove remains for trial. General Cinema is not entitled to an exhaustive, case-by-case search at trial in an effort to find a split that caused no competitive harm to Buena Vista and other distributors. When the per se rule applies, as the court believes it does, all agreements or practices of the type covered by the rule are "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Catalano, supra*, 446 U.S. at 646 n.9, 100 S.Ct. at 1927 n.9; *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1968). The per se rule in this manner serves to make the types of restraints proscribed by the Act more certain, to the benefit of all concerned, and helps "avoi[d] the necessity for an incredibly complicated and prolonged economic investigation . . .—an inquiry so often wholly fruitless when undertaken." *BMI, supra*, 441 U.S. at 8 n.11, 99 S.Ct. at 1556 n.11; *Northern Pacific, supra*, 356 U.S. at 5, 78 S.Ct. at 518. Cases that do not fit the generalization may arise, but "a *per se* rule reflects the judgment that such cases are not sufficiently common or important to justify the time and expense necessary to identify them." *Continental T.V., Inc. v. GTE Sylvania Inc., supra*, 433 U.S. at 50 n.16, 97 S.Ct. at 2557 n.16. As the Supreme Court stated in *Catalano, supra*:

> [W]hen a particular concerted activity entails an obvious risk of anticompetitive impact with no apparent potentially redeeming value, the fact that a practice may turn out to be harmless in a particular set of circumstances will not prevent its being declared unlawful *per se*.

*Id.* at 649, 100 S.Ct. at 1928.

CONCLUSION

For the reasons stated in this opinion, the court orders that counterclaimant Buena Vista's motion for partial summary judgment on the issue of liability be and hereby is GRANTED. All issues concerning damages, including proof of the existence and duration of splits in particular locations, remain to be litigated at trial.

IT IS SO ORDERED.